## CONNOLLY ET AL., TRUSTEES OF THE OPERATING ENGINEERS PENSION TRUST *v.* PENSION BENEFIT GUARANTY CORPORATION ET AL.

No. 84–1555.   Argued December 2, 1985—Decided February 26, 1986*

*Together with No. 84–1567, *Woodward Sand Co., Inc.* v. *Pension Benefit Guaranty Corporation et al.*, also on appeal from the same court.

212

WHITE, J., delivered the opinion for a unanimous Court.   O'CONNOR, J., filed a concurring opinion, in which POWELL, J., joined, *post*, p. 228.

*Wayne Jett* argued the cause and filed briefs for appellants in No. 84–1555.   *Richard M. Freeman* argued the cause for

appellant in No. 84–1567. With him on the brief was *Michael L. Jensen.*

*Baruch A. Fellner* argued the cause for appellees. With him on the brief were *Edward R. Mackiewicz, Mitchell L. Strickler, J. Stephen Caflisch, Peter H. Gould, David F. Power, Nathan Lewin,* and *Seth P. Waxman.*†

JUSTICE WHITE delivered the opinion of the Court.

In *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717 (1984), the Court held that retroactive application of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 did not violate the Due Process Clause of the Fifth Amendment. In these cases, we address the question whether the withdrawal liability provisions of the Act are valid under the Clause of the Fifth Amendment that forbids the taking of private property for public use without just compensation.

## I

## A

The background and legislative history of both the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 *et seq.,* and the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA or Act), 94 Stat. 1208, 29 U. S. C. §§ 1381–1461, are set forth in detail in *Gray, supra,* at 720–725. We therefore only summarize the

---

†Briefs of *amici curiae* urging reversal were filed for the American Trucking Associations, Inc., by *Carl L. Taylor, Glenn Summers, Daniel R. Barney,* and *Kenneth E. Siegel;* and for the National Association of Manufacturers by *Chester W. Nosal, John R. Keys, Jr., Columbus R. Gangemi, Jan S. Amundson,* and *Gary D. Lipkin.*

Briefs of *amici curiae* urging affirmance were filed for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder;* and for Trustees of the United Mine Workers of America 1950 and 1974 Pension Plans by *William F. Hanrahan* and *Israel Goldowitz.*

*William H. Towle* filed a brief for the American Warehousemen's Association as *amicus curiae.*

relevant portions of that description for purposes of our discussion here.

Congress enacted ERISA in 1974 to provide comprehensive regulation for private pension plans. In addition to prescribing standards for the funding, management, and benefit provisions of these plans, ERISA also established a system of pension benefit insurance. This "comprehensive and reticulated statute" was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans. . . . Congress wanted to guarantee that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it.'" 467 U. S., at 720, quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 361–362, 374–375 (1980) (citations omitted).

To achieve this goal of protecting "anticipated retirement benefits," Congress created the Pension Benefit Guaranty Corporation (PBGC), a wholly owned Government corporation, to administer an insurance program for participants in both single-employer and multiemployer pension plans. 29 U. S. C. § 1302 (1976 ed.). For single-employer plans that were in default, ERISA immediately obligated the PBGC to pay benefits. § 1381. With respect to multiemployer plans, ERISA delayed mandatory payment of guaranteed benefits until January 1, 1978. Until that date, Congress gave the PBGC discretionary authority to pay benefits upon the termination of multiemployer pension plans. §§ 1381(c)(2)–(4). As with single-employer plans, all contributors to covered multiemployer plans were assessed insurance premiums payable to the PBGC. If the PBGC exercised its discretion to pay benefits upon a plan's termination, all employers that had contributed to the plan during the five years preceding its termination were liable to the PBGC in amounts proportional

to their shares of the plan's contributions during that period, subject to the limitation that any individual employer's liability could not exceed 30% of the employer's net worth. § 1362(b)(2).

During the period between the enactment of ERISA and 1978, when mandatory multiemployer guarantees were due to go into effect, the PBGC extended coverage to numerous plans. "Congress became concerned that a significant number of plans were experiencing extreme financial hardship," *Gray, supra*, at 721, and that implementation of mandatory guarantees for multiemployer plans might induce several large plans to terminate, thus subjecting the insurance system to liability beyond its means. As a result, Congress delayed the effective date for the mandatory guarantees for 18 months, Pub. L. 95–214, 91 Stat. 1501, and directed the PBGC to prepare a report analyzing the problems of multiemployer plans and recommending possible solutions. See S. Rep. No. 95–570, pp. 1–4 (1977); H. R. Rep. No. 95–706, p. 1 (1977).

The PBGC's Report found, *inter alia*, that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Gray, supra*, at 722. The "basic problem," the Report found, was the threat to the solvency and stability of multiemployer plans caused by employer withdrawals, which existing law actually encouraged. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P. L. 95–214, pp. 96–97 (1978) (PBGC Report).[1] As the PBGC's Executive Director explained:

---

[1] The inadequacy of existing law was demonstrated by the Report's finding that roughly 10% of all multiemployer plans, covering 1.3 million participants, were experiencing financial difficulties. PBGC Report, at 1. Funding of all plan benefits under these plans, if they terminated, would cost the insurance system approximately $4.8 billion and necessitate an increase in premiums to unacceptable levels. *Id.*, at 2, 16, 139. See also

"A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue." Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind) (hereinafter 1978 Hearings).

"To alleviate the problem of employer withdrawals, the PBGC suggested new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded liabilities was attributable to that employer's participation." *Gray*, 467 U. S., at 723, citing PBGC Report, at 97–114 (footnote omitted). Again, the PBGC Executive Director explained:

"To deal with this problem, our report considers an approach under which an employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities. In

---

Hearings on the Multiemployer Pension Plan Amendments Act of 1979 before the Task Force on Welfare and Pension Plans of the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 96th Cong., 1st Sess. 1156, 1170, 1291 (1980). See also Brief for National Coordinating Committee for Multiemployer Plans as *Amicus Curiae* 12–14; Brief of Trustees for United Mine Workers of America 1950 and 1974 Pension Plans as *Amici Curiae* 7.

other words, the plan would have a claim against the employer for the inherited liabilities which would otherwise fall upon the remaining employers as a result of the withdrawal. . . .

"We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan." 1978 Hearings, at 23 (statement of Matthew M. Lind).

After 17 months of discussion, Congress agreed with the analysis put forward in the PBGC Report, and drafted legislation which implemented the Report's recommendations. "As enacted, the Act requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *Gray, supra,* at 725, quoting 29 U. S. C. §§ 1381, 1391.

### B

Appellant Trustees administer the Operating Engineers Pension Plan according to a written Agreement Establishing the Operating Engineers Pension Trust, executed in 1960, pursuant to § 302(c)(5) of the Labor Management Relations Act, 1947, 29 U. S. C. § 186(c)(5). App. 29. The Trust receives contributions from several thousand employers under written collective-bargaining agreements covering employees in the construction industry throughout southern California and southern Nevada. Under these collective-bargaining agreements, the employers agree to contribute a certain amount to the Pension Plan, with the actual amount contributed by each employer determined by multiplying their employees' hours of service by a rate specified in the current agreement. See *id.,* at 33–35.

By the express terms of the Trust Agreement, *id.*, at 30–31, and the Plan, *id.*, at 31–32, the employer's sole obligation to the Pension Trust is to pay the contributions required by the collective-bargaining agreement. The Trust Agreement clearly states that the employer's obligation for pension benefits to the employee is ended when the employer pays the appropriate contribution to the Pension Trust.[2] This is true even though the contributions agreed upon are insufficient to pay the benefits under the Plan.[3]

---

[2] Article II, § 7, of the Trust Agreement provides as follows:

"Neither the Employers nor any Signatory Association, or officer, agent, employee or committee member of the Employers or any Signatory Association, shall be liable to make Contributions to the Fund or with respect to the Pension Plan, except to the extent that he or it may be an Individual Employer required to make Contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he or it may incur liability as a Trustee as hereinafter provided. Except as provided in Article III hereof, the liability of any Individual Employer to the Fund, or with respect to the Pension Plan, shall be limited to the payments required by the Collective Bargaining Agreements with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the Contributions due from other Individual Employers or with respect to the operations of such Individual Employers. The Individual Employers shall not be required to make any further payments or Contributions to the cost of operations of the Fund or of the Pension Plan, except as may be hereinafter provided in the Collective Bargaining Agreements." App. 30–31.

[3] Article VII, § 4, of the Plan provides as follows:

"This Pension Plan has been adopted on the basis of an actuarial calculation which has established, to the extent possible, that the contributions will, if continued, be sufficient to maintain the Plan on a permanent basis. However, it is recognized that the benefits provided by this Pension Plan can be paid only to the extent that the Plan has available adequate resources for those payments. No Individual Employer has any liability, directly or indirectly to provide the benefits established by this Plan beyond the obligation of the Individual Employer to make contributions as stipulated in any Collective Bargaining Agreement. In the event that at any time the Pension Fund does not have sufficient assets to permit continued payments under this Pension Plan, nothing contained in this Pension Plan and the Trust Agreement shall be construed as obliging any Individual Employer to make benefit payments or contributions (other than the con-

In 1975, the Trustees filed suit, seeking declaratory and injunctive relief, claiming that the Pension Plan is a "defined contribution plan" as defined by ERISA, and thus not subject to the jurisdiction of the PBGC.[4]   Alternatively, the Trustees argued that if the Plan was subject to the provisions of ERISA requiring premium payments and imposing contingent termination liability, the statute was unconstitutional, as it deprived the Trustees, the employers, and the plan participants of property without due process and without proper compensation.

The District Court granted summary judgment to the Trustees, finding that the Plan was a "defined contribution plan," and enjoining the PBGC from treating it in any other manner.   *Connolly* v. *Pension Benefit Guaranty Corporation*, 419 F. Supp. 737 (CD Cal. 1976).   The Ninth Circuit reversed and remanded for consideration of the constitutional issues.   *Connolly* v. *Pension Benefit Guaranty Corporation*, 581 F. 2d 729 (1978), cert. denied, 440 U. S. 935 (1979). On remand, the District Court denied the Trustees' motion to convene a three-judge court on the ground that the Trustees' constitutional challenges were insubstantial.   App. 55–56. The Trustees sought a petition of mandamus on the issue, but their petition was denied by both the Ninth Circuit and this Court.   *Connolly* v. *Williams*, No. 79–7580 (Jan. 14,

---

tributions for which the Individual Employer may be obliged by any Collective Bargaining Agreement) in order to provide for the benefits established by the Pension Plan.   Likewise, there shall be no liability upon the Board of Trustees, individually or collectively, or upon the Employers, Signatory Association, Individual Employer, or Union to provide the benefits established by this Plan if the Pension Fund does not have the assets to make such benefit payments."   *Id.*, at 31–32.

[4] Title 29 U. S. C. § 1002(34) describes a "defined contribution plan" as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."   The Plan Termination Insurance provisions of ERISA do not apply to such plans.   § 1321(b)(1).

1980); *Connolly* v. *United States District Court*, 445 U. S. 959 (1980).

On the merits, the District Court granted summary judgment to the PBGC, but the Ninth Circuit reversed. 673 F. 2d 1110 (1982). The court could not agree with the District Court that the constitutional claims raised by the Trustees were so "insubstantial" that a three-judge panel could be summarily denied. *Id.*, at 1114. The Ninth Circuit remanded the case with directions to convene a three-judge court.

During the course of the litigation to convene the three-judge court, Congress enacted the MPPAA. The District Court permitted the Trustees to file an amended complaint to include a challenge to the constitutionality of the new Act. The court also permitted appellant Woodward Sand Co., an employer that had been assessed withdrawal liability by the Trustees, to intervene in the action. App. 82.[5]

After oral argument, the three-judge panel granted summary judgment in favor of the PBGC. The court rejected appellants' argument that the Act violated the Taking Clause of the Fifth Amendment, holding that "the contractual right which insulates employers from further liability to the pension plans in which they participate is not 'property' within the meaning of the takings clause." 631 F. Supp. 640, 645 (1984). Because the court resolved this issue "on the basis that no 'property' is affected by the MPPAA," it did not discuss whether a "taking" had occurred, or whether the taking would have been for a "public purpose." *Ibid.*[6]

---

[5] Penfield & Smith, Inc., Roy L. Klema Engineers, Inc., and Municipal Engineers, Inc., also intervened in the proceedings before the District Court. These employers are not parties to this appeal, however, as the Trustees have determined that they have incurred no liability under the Act. Brief for Appellant in No. 84–1567, p. ii.

[6] The three-judge court also rejected appellants' arguments that the MPPAA violated due process, the Contract Clause, and several other constitutional provisions. See App. to Juris. Statement in No. 84–1555, pp. 8–14.

Both the Trustees and Woodward Sand Co. invoked the appellate jurisdiction of this Court under 28 U. S. C. § 1253. We noted probable jurisdiction, 472 U. S. 1006 (1985), and now affirm.

## II

Appellants challenge the District Court's conclusion that the Act does not effect a taking of "property" within the meaning of the Taking Clause of the Fifth Amendment. Rather than specifically asserting that the contractual limitation of liability is property, however, appellants argue that the imposition of noncontractual withdrawal liability violates the Taking Clause by requiring employers to transfer their assets for the private use of pension trusts and, in any event, by requiring an uncompensated transfer.[7]

---

The panel's decision upholding the constitutionality of the MPPAA is consistent with the result reached by every other court to have considered the issue. *Keith Fulton & Sons, Inc.* v. *New England Teamsters and Trucking Industry Pension Fund,* 762 F. 2d 1124 (CA1 1984), modified on other grounds, 762 F. 2d 1137 (1985); *Board of Trustees of Western Conference of Teamsters Pension Trust Fund* v. *Thompson Building Materials, Inc.,* 749 F. 2d 1396 (CA9 1984), cert. denied, 471 U. S. 1054 (1985); *Terson Co.* v. *Bakery Drivers and Salesmen Local 194,* 739 F. 2d 118 (CA3 1984); *Washington Star Co.* v. *International Typographical Union Negotiated Pension Plan,* 235 U. S. App. D. C. 1, 729 F. 2d 1502 (1984); *Textile Workers Pension Fund* v. *Standard Dye & Finishing Co.,* 725 F. 2d 843 (CA2), cert. denied *sub nom. Sibley, Lindsay & Curr Co.* v. *Bakery Workers,* 467 U. S. 1259 (1984); *Peick* v. *Pension Benefit Guaranty Corporation,* 724 F. 2d 1247 (CA7 1983), cert. denied, 467 U. S. 1259 (1984); *Republic Industries, Inc.* v. *Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F. 2d 628 (CA4 1983), cert. denied, 467 U. S. 1259 (1984); *Dorn's Transportation, Inc.* v. *I. A. M. National Pension Fund Benefit Plan,* 578 F. Supp. 1222 (DC 1984), aff'd, 243 U. S. App. D. C. 348, 753 F. 2d 166 (1985); *Speckmann* v. *Paddock Chrysler Plymouth, Inc.,* 565 F. Supp. 469 (ED Mo. 1983). In *Keith Fulton, Thompson Building Materials, Terson, Peick, Republic Industries, Dorn,* and *Speckmann,* the Taking Clause claim was directly at issue.

[7] Appellant Trustees make two additional arguments as well. First, they argue that if the imposition of withdrawal liability is invalid under the Taking Clause, then the related provisions of the MPPAA requiring multi-

We agree that an employer subject to withdrawal liability is permanently deprived of those assets necessary to satisfy its statutory obligation, not to the Government, but to a pension trust. If liability is assessed under the Act, it constitutes a real debt that the employer must satisfy, and it is not an obligation which can be considered insubstantial. In the present litigation, for example, appellant Woodward Sand Co.'s withdrawal liability, after the Trustees' assessment was reduced by an arbitrator, was approximately $200,000, or nearly 25% of the firm's net worth. Juris. Statement in No. 84–1567, p. 7, n. 7.

But appellants' submission—that such a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment—if accepted, would

employer plans to pay premiums to the PBGC are also invalid, as they are inseverable from the overall statutory scheme. Second, the Trustees contend that the statutory provisions requiring multiemployer plans to pay premiums to the PBGC and authorizing the PBGC to use the funds "in its discretion" to pay benefits to participants of a terminated multiemployer plan violate the principle of separation of powers by delegating legislative authority to the PBGC.

Because we find that the withdrawal liability provisions of the Act are valid under the Taking Clause, we need not address the Trustees' first assertion. As to the Trustees' separation-of-powers contention, we find little merit in this argument. Title 29 U. S. C. § 1381(c)(2)(B) (1976 ed.) stated that the PBGC was to pay benefits if it determined that "the payment . . . of benefits guaranteed under [ERISA] with respect to that plan [would] not jeopardize the payments the [PBGC] anticipate[d] it may be required to make in connection with [the mandatory guarantee program]." Congress delegated discretionary, rather than mandatory, coverage for multiemployer plans prior to 1980 because it needed "time for thorough consideration of the complex issues posed by the termination of multiemployer pension plans." *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 721, n. 1 (1984). In these circumstances, the delegation of discretionary authority was a reasonable means of achieving congressional aims, and we are not persuaded that Congress failed to provide a clear "intelligible principle" to guide the PBGC in the exercise of this authority under the Act. See *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928).

prove too much. In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another. In *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1 (1976), we sustained a statute requiring coal mine operators to compensate former employees disabled by pneumoconiosis, even though the operators had never contracted for such liability, and the employees involved had long since terminated their connection with the industry. We said: "[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Id.*, at 15–16 (citations omitted).

Relying on *Turner Elkhorn*, we also rejected a due process attack on the imposition, under the statute now before us, of withdrawal liability on employers who withdrew before the effective date of the 1978 amendments. We held that Congress had acted within its powers and for sound reasons. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717 (1984). Although both *Gray* and *Turner Elkhorn* were due process cases, it would be surprising indeed to discover now that in both cases Congress unconstitutionally had taken the assets of the employers there involved.

Appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed. See nn. 2, 3, *supra*. "Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject

matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Norman* v. *Baltimore & Ohio R. Co.*, 294 U. S. 240, 307–308 (1935).

If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, ·the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. *Bowles* v. *Willingham*, 321 U. S. 503, 517 (1944); *Omnia Commercial Co.* v. *United States*, 261 U. S. 502, 508–510 (1923). This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation. But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose. That the statutory withdrawal liability will operate in this manner and will redound to the benefit of pension trusts does not justify a holding that the provision violates the Taking Clause and is invalid on its face.

This conclusion is not inconsistent with our prior Taking Clause cases. See, *e. g.*, *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984); *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982); *Hodel* v. *Virginia Surface Mining & Reclamation Assn.*, 452 U. S. 264 (1981); *Kaiser Aetna* v. *United States*, 444 U. S. 164 (1979); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978). In all of these cases, we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. *Monsanto Co.*, *supra*, at 1005; *Kaiser Aetna*, *supra*, at 175. To aid in this determination, however, we have identified

three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central Transportation Co., supra,* at 124. Accord, *Monsanto Co., supra,* at 1005; *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 82–83 (1980). Examining the MPPAA in light of these factors reinforces our belief that the imposition of withdrawal liability does not constitute a compensable taking under the Fifth Amendment.

First, with respect to the nature of the governmental action, we already have noted that, under the Act, the Government does not physically invade or permanently appropriate any of the employer's assets for its own use. Instead, the Act safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation. *Penn Central Transportation Co., supra,* at 124; *Usery* v. *Turner Elkhorn Mining Co., supra,* at 15, 16. See *Andrus* v. *Allard,* 444 U. S. 51, 65 (1979); *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413 (1922).

Next, as to the severity of the economic impact of the MPPAA, there is no doubt that the Act completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability. The assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions. Moreover, there are a significant number of provisions in the Act that moderate and mitigate the economic impact of an individual

employer's liability.[8]  There is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme.

The final inquiry suggested for determining whether the Act constitutes a "taking" under the Fifth Amendment is whether the MPPAA has interfered with reasonable investment-backed expectations.  Appellants argue that the only monetary obligations incurred by each employer involved in the Operating Engineers Pension Plan arose from the specific terms of the Plan and Trust Agreement between the employers and the union, and that the imposition of withdrawal liability upsets those reasonable expectations. Pension plans, however, were the objects of legislative concern long before the passage of ERISA in 1974, and

---

[8] Several sections of the Act moderate the impact of a withdrawing employer's liability by exempting certain transactions from being characterized as "withdrawals."  See, e. g., 29 U. S. C. §§ 1383(b), (c) (applying special definitions for determining whether there has been a complete or partial withdrawal from a pension plan in the building and construction industry and in the entertainment industry); § 1384 (cessation or reduction of contribution obligations as a result of an employer's sale of its assets does not result in a withdrawal, provided certain other conditions are met); § 1398(1) (change of corporate structure where successor continues to contribute to plan is not a withdrawal); § 1398(2) (withdrawal does not occur where employer suspends contributions to plan during labor dispute involving its employees).

Other sections reduce the size of the financial liability in various instances.  See, e. g., 29 U. S. C. § 1389(a) (creating a de minimis rule which eliminates withdrawal liability entirely for an employer whose obligation would be equal to or less than the smaller of (1) $3/4$ of 1% of the plan's unfunded vested obligations; or (2) $50,000); § 1405(a)(1) (limiting withdrawal liability for employer who liquidates his business); § 1390(a)(2) (establishing a "free look" provision, whereby new employers may withdraw without liability if they had an obligation to contribute for no more than six consecutive plan years, or, if shorter, the number of years required for vesting under the plan).

surely as of that time, it was clear that if the PBGC exercised its discretion to pay benefits upon the termination of a multi-employer pension plan, employers who had contributed to the plan during the preceeding five years were liable for their proportionate share of the plan's contributions during that period. 29 U. S. C. § 1364. It was also plain enough that the purpose of imposing withdrawal liability was to ensure that employees would receive the benefits promised them. When it became evident that ERISA fell short of achieving this end, Congress adopted the 1980 amendments. Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations. See *Gray*, 467 U. S., at 732. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *FHA* v. *The Darlington, Inc.*, 358 U. S. 84, 91 (1958). See also *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S., at 15–16 and cases cited therein.

The purpose of forbidding uncompensated takings of private property for public use is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960). We are far from persuaded that fairness and justice require the public, rather than the withdrawing employers and other parties to pension plan agreements, to shoulder the responsibility for rescuing plans that are in financial trouble. The employers in the present litigation voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA. We do not know, as a fact, whether this plan was underfunded, but Congress determined that unregulated withdrawals from multiemployer plans could endanger their financial vitality and deprive workers of the vested rights they were entitled to anticipate would be theirs upon retirement. For this reason, Congress

imposed withdrawal liability as one part of an overall statutory scheme to safeguard the solvency of private pension plans. We see no constitutionally compelled reason to require the Treasury to assume the financial burden of attaining this goal.

The judgment of the three-judge court is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE POWELL joins, concurring.

Today the Court upholds the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) against a facial challenge to their validity based on the Taking Clause of the Fifth Amendment. I join the Court's opinion and agree with its reasoning and its result, but I write separately to emphasize some of the issues the Court does *not* decide today. Specifically, the Court does not decide today, and has left open in previous cases, whether the imposition of withdrawal liability under the MPPAA and of plan termination liability under the Employee Retirement Income Security Act of 1974 (ERISA) may in some circumstances be so arbitrary and irrational as to violate the Due Process Clause of the Fifth Amendment. See *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 728, n. 7 (1984); *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 367–368 (1980). The Court also has no occasion to decide whether the MPPAA may violate the Taking Clause as applied in particular cases, or whether the pension plan in this case is a defined benefit plan rather than a defined contribution plan within the meaning of ERISA.

As the Court indicates, the mere fact that "legislation requires one person to use his or her assets for the benefit of another," *ante*, at 223, will not establish either a violation of the Taking Clause or the Due Process Clause. With regard to the latter provision, it is settled that in the field of economic legislation "the burden is on one complaining of a due

process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976). Nonetheless, the Court has never intimated that Congress possesses unlimited power to "readjus[t] rights and burdens . . . [and] upse[t] otherwise settled expectations." *Turner Elkhorn, supra,* at 16. Our recent cases leave open the possibility that the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee. See *Turner Elkhorn, supra,* at 19, 24–26; *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co., supra,* at 733 (discussing *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330 (1935)).

Insofar as the application of the provisions of the MPPAA and of ERISA to pension benefits that accrue in the future is concerned, there can be little doubt of Congress' power to override contractual provisions limiting employer liability for unfunded benefits promised to employees under the plan. But both statutes impose liability under certain circumstances on contributing employers for unfunded benefits that accrued in the past under a pension plan whether or not the employers had agreed to ensure that benefits would be fully funded. In my view, imposition of this type of retroactive liability on employers, to be constitutional, must rest on some basis in the employer's conduct that would make it rational to treat the employees' expectations of benefits under the plan as the employer's responsibility.

In enacting ERISA, Congress distinguished between two types of employee retirement benefit plans: "defined benefit plan[s]" and "defined contribution plan[s]," also known as "individual account plan[s]." See 29 U. S. C. §§ 1002(34), (35). An employer is subject to plan termination liability under ERISA only if the employee benefit plan to which the employer has contributed is covered by ERISA's plan termination insurance program, which applies to defined benefit

plans but not to defined contribution plans. 29 U. S. C. § 1321(b)(1). See *Nachman Corp.* v. *Pension Benefit Guaranty Corporation, supra,* at 363, n. 5. Congress exempted defined contribution plans from ERISA's termination insurance program because a defined contribution plan does not specify benefits to be paid, but instead establishes an individual account for each participant to which employer contributions are made. 29 U. S. C. § 1002(34). "[U]nder such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits." *Nachman Corp., supra,* at 364, n. 5.

By contrast, whenever a plan defines the benefits payable thereunder, the possibility exists that at a given time plan assets will fall short of the present value of vested plan benefits. Congress therefore subjected defined benefit plans to ERISA's plan termination insurance program, and did so by broadly defining a defined benefit plan as "a pension plan other than an individual account plan." 29 U. S. C. § 1002(35). We have no occasion today to decide whether this definition sweeps in all plans in which the benefits to be received by employees are fixed by the terms of the plan, even if the plan also provides that the employer's contributions shall be fixed and shall not be adjusted to whatever level would be required to provide those benefits. Indeed, this litigation began in part as a challenge by the Trustees of the Operating Engineers Pension Plan to a determination by the Pension Benefit Guaranty Corporation (hereinafter PBGC) that the Pension Plan is a defined benefit plan. See *ante,* at 219. That challenge was resolved against the Trustees and is not presented here.

ERISA's broad definition of defined benefit plan may well mean that Congress imposed contingent liability on contributing employers without regard to the extent of a particular employer's actual responsibility for the existence of a plan's promise of fixed benefits to employees and without regard to the extent to which any such promise was conditioned—and

understood by employees to be conditioned—by plan provisions limiting the employer's obligations to make contributions to the plan.  If so, the application of ERISA may in some circumstances raise constitutional doubts under the Taking Clause or the Due Process Clause.

The same doubts arise with respect to the imposition of withdrawal liability under the MPPAA, which is properly seen as a prophylactic extension of the liability initially imposed by ERISA.  Withdrawal liability is intended to ensure that "'an employer withdrawing from a multiemployer plan w[ill] . . . complete funding its fair share of the plan's unfunded liabilities,'" *R. A. Gray & Co.*, 467 U. S., at 723, n. 3 (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess., 23 (1978) (statement of Matthew M. Lind, Executive Director of PBGC), and thus presupposes that employers can be made liable for those unfunded liabilities in the first instance.  Although the MPPAA substitutes liability to the plan for liability to PBGC, the withdrawal liability it imposes on employers who contribute to multiemployer plans reflects the same apparent determination to treat all definite benefits as promises for which the employer can be held liable that underlies termination liability under ERISA.  PBGC coverage of a multiemployer plan continues to turn on whether it is a defined benefit plan, and the MPPAA defines the withdrawing employer's liability to the plan in terms of "unfunded vested benefits," 29 U. S. C. § 1391, thereby making withdrawal liability turn on the presence of fixed benefits.  The MPPAA's termination liability provisions are complex, but their overall effect is also to hold employers liable for underfunding of vested fixed benefits.  See 29 U. S. C. § 1341a.  Thus, it is evident that the MPPAA expands on Congress' decision in ERISA to exempt only defined contribution plans, narrowly defined, from PBGC coverage and employer liability.  Whether the employer's liability is to

PBGC or to the plan, the thrust of both statutes is to enforce the plan's promise of fixed benefits against the employer with respect to benefits already accrued.

The degree to which an employer can be said to be responsible for the promise of benefits made by a plan varies dramatically across the spectrum of plans. Where a single employer has unilaterally adopted and maintained a pension plan for its employees, the employer's responsibility for the presence of a promise to pay defined benefits is direct and substantial. The employer can nominate all the plan's trustees and enjoys wide discretion in designing the plan and determining the level of benefits. Where such a plan holds out to employees a promise of definite benefits, and where employees have rendered the years of service required for benefits to accrue and vest, it seems entirely rational to hold the employer liable for any shortfall in the plan's assets, even if the plan's provisions purport to limit the employer's liability in the event of underfunding upon plan termination.

Where a pension plan is established through collective bargaining between one or more employers and a union, matters may be different. Such plans, commonly known as "Taft-Hartley" plans, were authorized by § 302(c)(5) of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 157, codified, as amended, at 29 U. S. C. § 186(c)(5). Taft-Hartley plans are the product of joint negotiation between employers and a union representing employees and are administered by trustees nominated in equal numbers by employers and the union. *Ibid.* Unlike typical defined benefit plans, which call for variable employer contributions and provide for fixed benefits, most Taft-Hartley plans "possess the characteristics of both fixed contributions and fixed benefits." J. Melone, Collectively Bargained Multi-Employer Pension Plans 20 (1963) (hereinafter Melone). As PBGC has explained:

> "Employers participating in multiemployer plans are generally required to contribute at a fixed rate, specified

in the collective bargaining agreement. . . . Traditionally, the multiemployer plan or the bargaining agreement have limited the employer's contractual obligation to contribute at the fixed rate, whether or not the contributions were sufficient to provide the benefits established by the joint board or the collectively bargained agreement." Pension Benefit Guaranty Corporation, Multiemployer Study Required by P. L. 95–214, p. 22 (1978) (hereinafter Multiemployer Study).

See also Melone 50; Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L. Rev. 911, 931 (1970).

Under these hybrid Taft-Hartley plans it is the plans' trustees, not the employers and the union, who are "usually responsible for determining the types of benefits to be provided . . . and the level of benefits, although in some cases these are set in the collective bargaining agreement." Multiemployer Study 22 (footnote omitted). See also GAO/ HRD–85–58, Comptroller General's Report to the Congress, Effects of the Multiemployer Pension Plan Amendments Act on Plan Participants' Benefits, 37, App. I, Table 3 (June 14, 1985) (95% of 139 multiemployer plans surveyed provided that trustees set benefits) (hereinafter Report to the Congress). This delegation of responsibility to the trustees may well stem from an understanding on the part of employers and unions that under the fixed-contribution approach the plan rather than the employers would bear the risks of adverse experience and the benefits of favorable experience in the first instance. See Pension Plans Under Collective Bargaining: A Reference Guide for Trade Unions 64 (American Federation of Labor 1953). If the actuary's earnings assumptions proved too conservative, the plan would have excess assets that could be used to support an increase in benefits by the trustees, and if asset growth was lower than anticipated, benefits could be reduced. It now appears that Taft-Hartley plan employers will be liable for such experi-

ence losses in many cases, even where withdrawal occurs as a result of events over which an employer has no control, and even though experience gains can still ordinarily be used to increase benefits.

It is also noteworthy that, as this Court held in *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 331–332 (1981), "the duty of the management-appointed trustee of an employee benefit fund under § 302(c)(5) is directly antithetical to that of an agent of the appointing party." ERISA conclusively established that "an employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him." *Id.*, at 334. In light of these fiduciary duties, it seems remarkable to impute responsibility to employers for the level of benefits promised by the plan and set by the joint board of trustees, notwithstanding the express limits on employer liability contained in the plan and agreed to in collective bargaining.

Yet that would appear to be what Congress may have done to the extent a Taft-Hartley plan such as the pension plan in this case is treated as a pure defined benefit plan in which the employer promised to make contributions to the extent necessary to fund the fixed benefits provided in the plan. As Representative Erlenborn put it in the hearings on the MPPAA:

> "[W]e have taken something that neither looked like a duck, or walked like a duck, or quacked like a duck, and we passed a law [ERISA] and said, 'It is a duck.' If it is that easy, I suppose we can repeal the law of gravity and solve our energy problem. It is treating the multiemployer plans where you negotiate a *contribution* as having put a legal obligation on the employer to reach a level of *benefits* that has caused the problem." Hearings on The Multiemployer Pension Plan Amendments Act of 1979 before the Task Force on Welfare and Pension Plans of the Subcommittee on Labor-Management

Relations of the House Committee on Education and Labor, 96th Cong., 391 (1980) (emphasis added).

The foregoing observations suggest to me that whatever promises a collectively bargained plan makes with respect to benefits may not always be rationally traceable to the employer's conduct and that it may sometimes be quite fictitious to speak of such plans as "promising" benefits at a specified level, since to do so ignores express and bargained-for conditions on those promises. Where the plan's fixed-contribution aspects were agreed to by employees through their exclusive bargaining representatives, and where employers had no control over the level of benefits promised, employer responsibility for the benefits specified by the plan is very much attenuated, and employee expectations that those benefits will in all events be paid, in the face of plan language to the contrary, are not easily traceable to the employer's conduct.

The possible arbitrariness of imposing termination and withdrawal liability on some employers contributing to fixed-cost Taft-Hartley plans may be heightened in particular cases. For example, an employer who agrees to participate in a multiemployer plan long after the plan's benefit structure has been determined may have had no say whatever in establishing critical features of the plan that determine the level of benefits and the value of those benefits. Similarly, if a plan had regularly undergone increases and reductions in accrued benefits prior to ERISA, any contention that employers caused employees to rely on a promise of fixed benefits might carry even less weight.

Beyond that, the withdrawal provisions of the MPPAA are structured in a manner that may lead to extremely harsh results. For example, it appears that even if the trustees raised benefits for both retired and current employees during the period immediately prior to an employer's withdrawal, the withdrawing employer can be held liable for the resulting underfunding. Such benefit increases are not uncommon.

See Report to the Congress 43, App. I, Table 17 (68% of multiemployer plans surveyed increased benefits for working participants during 33 months prior to enactment of the MPPAA); Table 18 (46% of these plans increased retirees' benefits during the same period). In addition, the presumptive method for calculating employer withdrawal liability is based on the employer's proportionate share of the *contributions* made to the plan during the years in which the employer participated. 29 U. S. C. § 1391(b). As a result, because fixed-contribution plans typically do not set each employer's contributions on the basis of the value of the benefits accrued by that employer's employees, it seems entirely possible that an employer may be liable to the plan for substantial sums even though that employer's contributions plus its allocable share of plan earnings *exceed* the present value of all benefits accrued by its employees.

To be sure, the Court does not address these questions today. Since this case involves only a facial challenge under the Taking Clause to the MPPAA's withdrawal liability provisions, the Court properly refuses to look into the possibility that harsh results such as those I have noted may affect its analysis, let alone a due process inquiry, when the MPPAA is applied in particular cases. I write only to emphasize some of the issues the Court does not decide today, and to express the view that termination liability under ERISA, and withdrawal liability under the MPPAA, impose substantial retroactive burdens on employers in a manner that may drastically disrupt longstanding expectations, and do so on the basis of a questionable rationale that remains open to review in appropriate cases.