gated); *Muller Fuel Oil Co. v. Insurance Co. of N. Am.*, 232 A.2d 168, 173 (App.Div. 1967) (same).

In conclusion, the Court finds no basis either in the policy definitions, policy requirements or in the basis of the *Cohen* suit for reaching a contrary conclusion. The fact that the *Cohen* suit refers to the maintenance of the securities fraud action adds nothing to the malicious prosecution count. The language "exposure to conditions," contained in the definition of occurrence, does not support Werner's position. The Court concludes that the damage occurred when the underlying suit was filed. The Court is not persuaded that the policy's notice requirements are inconsistent with the interpretation advanced by Royal in this case. Moreover, it is certainly within the insurer's prerogative to require notice of every lawsuit that its insured files.

Accordingly, the Court will grant Royal's judgment on the pleadings.

**CALLAWAY COMMUNITY HOSPITAL, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, Defendant.**

**No. 89–4488–CV–C–5.**

United States District Court, W.D. Missouri, Central Division.

Jan. 8, 1992.

E.J. Holland, Jr., James A. Snyder, Spencer, Fane, Britt & Browne, Kansas City, Mo., for plaintiffs.

Jean Paul Bradshaw, II, U.S. Attorney's Office, Kansas City, Mo., Harriet Kerwin, U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER

SCOTT O. WRIGHT, Senior District Judge.

On September 16 and 17, 1991, the six remaining plaintiffs in this case presented their evidence at trial. At the close of plaintiffs' case, defendant moved to dismiss, pursuant to Federal Rule of Civil Procedure 41(b). The Court took defendant's motion under advisement and asked the parties to brief the issue of whether plaintiffs had carried their burden of proof in this case.

Plaintiffs, a group of rural Hill–Burton hospitals, have two remaining

claims which consist of constitutional challenges to the Prospective Payment System (PPS) formula, as it applies to them. Plaintiffs focus their constitutional claims on the compound effect of the 1974 Hill–Burton Act regulation, which requires Medicare participation by Hill–Burton facilities, and 1983 Medicare Act regulations, which establish the Prospective Payment System to replace the former actual-costs reimbursement program. Plaintiffs' first constitutional claim alleges that defendant has violated the due process clause of the Fifth Amendment of the Constitution; plaintiffs contend that the PPS reimbursement rates are confiscatory and constitute a taking without just compensation. A court must conduct an ad hoc, factual review of a taking claim by considering: (1) economic effects of the regulation; (2) extent of regulatory interference with "investment-backed expectations"; and (3) character of the government's action. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

██ Alternatively, plaintiffs assert that the PPS reimbursement rates violate the due process clause of the Fifth Amendment by impermissibly impairing the contract rights established by their Hill–Burton contracts. Government regulations that substantially diminish contractual rights may create an unconstitutional impairment of the contract. *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 278–79, 89 S.Ct. 518, 524–25, 21 L.Ed.2d 474 (1969).

The parties have fully briefed the merits of defendant's Rule 41(b) motion. The Court's findings of fact and conclusions of law are set forth in Sections II and III below. Based upon those findings, the Court sustains defendant's motion to dismiss.

## I. STANDARD FOR DISMISSAL UNDER RULE 41(b)

██ At the close of plaintiffs' evidence, defendant moved for dismissal, pursuant to Federal Rule of Civil Procedure 41(b). Rule 41(b) provides that, in a court-tried action, the defendant may move to dismiss on the ground that "the plaintiff has shown no right to relief." If the plaintiff has not made out the case and if the defense motion is to be granted, the court must make findings of fact and conclusions of law, as is required by Rule 52(a). A court's analysis under Rule 41(b) entails the same analysis required at the conclusion of all the evidence in a court-tried case. *Lang v. Cone*, 542 F.2d 751, 754 (8th Cir.1976); *see also* 9 Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 2371 (1971) (court is to weigh the evidence and decide by the preponderance of the evidence). The court should assess the witnesses' credibility, weigh the evidence and decide the facts. *Continental Cas. Co. v. DLH Serv., Inc.*, 752 F.2d 353, 356 (8th Cir.1985).

## II. FINDINGS OF FACT

At trial, plaintiffs presented six witnesses: an accountant and executive officers from five of the six plaintiff-hospitals. Those witnesses, the exhibits, and previously filed portions of the record constitute the evidence presented in this case. In conformity with Rule 41(b), the Court sets forth the following findings of fact.

1. All six of the remaining plaintiffs executed applications under the Hill–Burton Act, 42 U.S.C.A. § 291 *et seq.* (1991), wherein they made certain assurances in exchange for federal funding to improve the availability and quality of medical facilities for all people. This Court has previously ruled that plaintiffs have certain contractual rights by virtue of their Hill–Burton applications. *See* Order (Aug. 14, 1991). Each plaintiff entered its initial Hill–Burton agreement before the Medicare Act was established.

2. All six plaintiffs are rural hospitals, located in Missouri. Because of their proximity to urban area hospitals (within thirty miles or less), plaintiffs must compete with urban markets for resources.

3. In consideration for the Hill–Burton funds, each plaintiff gave assurances to provide community service. The terms of their Hill–Burton applications vary slightly. The following four plaintiffs assured that

they would "operate without discrimination because of race, creed or color": Barton Hospital, Bates County Memorial Hospital, Lincoln County Memorial Hospital, Still Regional Medical Center.

Hermann Area District Hospital's application form includes the assurance of non-discriminatory care, but that assurance is not checked. Instead, the phrase, "See HEW 441" is typed and checked above the section on "separate but equal" facilities.

Nevada City Hospital's Hill–Burton application assures that all services will be "available without discrimination on account of creed, and no professionally qualified person will be discriminated against on account of creed with respect to the privilege of professional practice in the facility."

4. The Hill–Burton Act and its related regulations mandate that, as part of their community service assurance, Hill–Burton hospitals must provide medical services to Medicare patients. 42 U.S.C.A. § 291c(e) 42 C.F.R. § 124.603 (1990).

5. In 1983, the method of reimbursing plaintiffs' Medicare costs changed, so that service providers are now reimbursed at a set fee established by the Prospective Payment System (PPS), rather than reimbursement of their actual Medicare costs. 42 U.S.C.A. § 1395ww(d), 42 C.F.R. § 412.60 (1990). The PPS-set fee is based on a formula that factors costs for the Diagnosis–Related–Group (DRG) and costs for the area wage index. A hospital's actual costs are generally disregarded, even if the patient must stay in the hospital longer than expected. In the case of rural hospitals, both the wage index and the DRG components are calculated according to average costs incurred by rural hospitals, making the rural PPS rates less than those paid urban hospitals. The rural wage index component is based on a state-wide average, in contrast with the urban wage index, which is based on the average for that particular urban area. In other words, the urban area hospitals receive PPS rates which are based on more individualized components, while rural hospitals receive PPS reimbursements calculated according to state-wide averages without regard to their individualized costs.

6. ProPAC stands for Prospective Payment Assessment Commission, the body responsible for studying and reporting the effects of the PPS to Congress and to the Secretary of Health and Human Services. 42 U.S.C.A. § 1395ww(e)(1)(B)(ii). The ProPAC report contains national statistics, national averages, and a review of issues concerning hospital margin-of-performance under the PPS. *See* Prospective Payment Assessment Commission, *Medicare and the American Health Care System: Report to the Congress* (June 1991) (hereafter *ProPAC* report).

7. Plaintiff Barton County Memorial Hospital, located in Lamar, is a sixty-six bed hospital and must compete with hospitals in the Joplin area, which receive higher Medicare reimbursements because of their urban designation.

8. Bates Hospital, a sixty-bed facility situated in Butler, competes for staff with a nearby urban hospital, which receives higher PPS reimbursements.

9. Located in Hermann, the Hermann Area District Hospital is licensed for 46 inpatient beds, and utilizes variable staffing for up to 43 beds. Hermann Hospital competes with the Columbia and St. Louis labor markets.

10. Lincoln County Memorial Hospital, located in Troy, is seven miles from the nearest urban area. Lincoln Hospital is licensed for 106 beds, but currently staffs for 64 beds.

11. Nevada City Hospital is located in Nevada.

12. Still Regional Medical Center, now known as Charles E. Still Osteopathic Hospital, is a rural hospital located in Jefferson City only ten miles from an urban county line. It is licensed for 169 beds, but staffs only 78 beds. Still competes with the urban-area hospitals in Columbia, thirty miles away.

13. A cost report for each plaintiff-hospital was submitted into evidence. The cost reports summarize the Medicare margins for each of the seven reported years

during PPS. This Court finds that five of the six plaintiffs have incurred significant, negative PPS margins:

a. Barton Hospital experienced negative Medicare profit margins during PPS–4 (the fourth year of the PPS, –$7,159), PPS–5 (–$7,911), and PPS–7 (–$18,888). For the combined seven years of the PPS, Barton Hospital had a positive Medicare margin of $361,588; total PPS margin (positive $1,746,082).

b. Since implementation of PPS, Bates Hospital has experienced declining PPS margins which closely parallel the ProPAC margins reported for rural hospitals. The PPS margins for Bates Hospital were positive until PPS–6, when it incurred a negative margin of $56,422, and PPS–7, with a negative margin of $59,142. The PPS margin for the total seven years is positive $740,164, with an overall declining trend in PPS margins.

c. In PPS–1 Hermann Area District Hospital incurred a negative PPS margin (–$117,439), as it did in all other years of PPS: PPS–2 (–$3,984); PPS–3 (–$216,384); PPS–4 (–$172,098); PPS–5 (–$284,218); PPS–6 (–$340,911); PPS–7 (–$317,965). The total PPS margin for Hermann Hospital is a negative $1,452,999.

d. Lincoln Hospital has experienced negative PPS margins, significantly worse than the ProPAC reported averages. Lincoln Hospital experienced a dramatic negative trend in PPS margins for PPS–3 (–$57,969), PPS–4 (–$487,973), PPS–5 (–$823,931), PPS–6 (–$1,158,037), and PPS–7 (–$1,174,953). During the seven years of the PPS, the hospital has had a PPS margin of negative $2,865,904.[1]

e. Still Hospital incurred negative Medicare margins during PPS–4 (–$517,882), PPS–5 (–$463,446), PPS–6 (–$621,296), and PPS–7 (–$850,540). During the seven PPS years, Still Hospital suffered a total negative Medicare margin of $1,280,662.

f. Nevada City Hospital has experienced declining PPS margins. However, the hospital has experienced positive PPS margins for each of its six reported years: PPS–1 ($665,503); PPS–2 ($486,826); PPS–3 ($221,925); PPS–4 ($221,253); PPS–5 ($96,896); PPS–6 ($53,679).

14. Plaintiff-hospitals' profit margins fluctuated during the PPS years in issue. In general, plaintiffs' losses could be attributed to declining patient volume while costs remained the same. In general, plaintiff-hospitals have significantly modified their operations to remain economically competitive and to satisfy areas of need within their communities. For instance, many of the plaintiffs began providing long-term nursing home programs, rehabilitation departments, psychology departments, and swing-beds, in place of vacant acute-care beds.

15. This Court finds that at least two plaintiffs, Hermann Hospital and Lincoln Hospital, experienced negative profit margins on certain categories of non-Medicare, patient services.

■ 16. Mr. Fogel was the expert witness for plaintiffs; he is an accountant, experienced in hospital administration. His firm is employed by five of the six plaintiff-hospitals. Mr. Fogel stated at trial, "My overall opinion is that the Prospective Payment System is causing the plaintiff hospitals to lose money." Mr. Fogel based his opinion exclusively on the ProPAC reports and his personal observations. This Court finds that Mr. Fogel lacked an adequate basis for his opinion, due to the following reasons. He lacked knowledge of ProPAC's methodology or the report's relevance to plaintiffs. He did not consider variables that may influence the PPS margins. He failed to evaluate the reasonableness of plaintiffs' Medicare costs and the reasonableness of the PPS reimbursement rates. Although he testified that plaintiffs had done everything possible by reasonably modifying their operations, he failed to evaluate whether those modifications were financially beneficial. His conclusory opinions, based on ProPAC, are uncorroborated because he failed to investigate whether plaintiffs matched the criteria of the hospital subsets analyzed by ProPAC.

17. The Court finds that the Medicare costs represented in plaintiffs' cost reports do not necessarily present plaintiffs' *actual* costs, because of the government's reporting methodology. Evidence showed that the actual hospital room costs are static and unaffected by how the hospital uses the room. However, the plaintiffs' reports designate the routine room cost for acute care as $338.16 and the routine cost for that same room when used for swing-bed patients as between $37.00 and $46.00.

18. A variety of complex factors affect the PPS margins of plaintiffs and other rural hospitals, including such factors as average in-patient length of stay, fixed costs, hospital size, occupancy rate, occupancy fluctuations, case-mix, staffing levels, geography, and number of hospitals and physicians in the area. Due to the complexity of these factors, "it remains difficult to assess the effects of PPS." *See* ProPAC Report 83.

### III.  CONCLUSIONS OF LAW

Plaintiffs, rural Hill–Burton hospitals, raise two constitutional challenges to the Prospective Payment System (PPS) formula. Plaintiffs base their constitutional claims on the combined effect of the 1974 regulation promulgated under the Hill–Burton Act, 42 C.F.R. § 124.603 (previously codified at 42 C.F.R. § 53.113 (1974)), and the 1983 regulations promulgated under the Medicare Act, which establish the Prospective Payment System, 42 C.F.R. § 412.-60. The Hill–Burton regulation makes Medicare participation by Hill–Burton facilities mandatory and the Medicare regulations displace the previous Medicare program which reimbursed actual costs.

### A.  *Takings Claim*

■ Plaintiffs allege that defendant has violated the due process clause of the Fifth Amendment of the Constitution, by imposing these two regulatory programs. Plaintiffs contend that the PPS, as applied to them, is confiscatory and constitutes a taking without just compensation. *See* 42 U.S.C.A. § 291 *et seq.* (Hill Burton Act, Title VI of the Public Health Service Act)

and Order (issued Aug. 14, 1991). A court must conduct an ad hoc, factual review of a taking claim by considering: (1) economic effects of the regulation; (2) extent of regulatory interference with "investment-backed expectations"; and (3) character of the government's action. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (temporary, regulatory takings may require just compensation). The Constitution does not proscribe governmental takings, it mandates that such takings must be justly compensated. Compensation is measured in terms of fairness and equity. *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 630–31, 81 S.Ct. 784, 789, 5 L.Ed.2d 838 (1961). In another context, government review of electrical power rates, the Supreme Court has held that rate setting is not an exact science, but that there is a range of just and reasonable rates. *Federal Power Comm'n v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976).

■ Semantically speaking, the terms "effects of" in element one of a takings claim demand a *showing of cause*—in this case, a showing of the economic effects of the regulations. Thus, plaintiffs were required, as part of their burden, to demonstrate a nexus between the PPS reimbursement rates and their declining PPS margins. The fact that plaintiffs lose money under the PPS is not enough, especially where the losses may result from a number of complex variables other than the regulation. Plaintiffs failed to prove that the PPS *caused* their losses or a portion of those losses.

Plaintiffs' expert, Mr. Fogel, swore in an affidavit that "a variety of circumstances ... could have a negative impact on Medicare margins, one of the most significant of which is the PPS reimbursement formula." Affidavit (filed June 10, 1991). He also testified that factors such as geography, number of hospitals in the area, and staffing levels affect plaintiffs' margins. The

ProPAC report, upon which Mr. Fogel chiefly relied, states, "[E]ven with these data, which raise many new questions as others are answered, it remains difficult to assess the effects of PPS." *ProPAC Report* 83.

Although plaintiffs' annual Medicare cost reports demonstrate that five of them suffered negative Medicare margins and that the other plaintiff incurred a declining Medicare margin, there is insufficient evidence to prove that the PPS regulations caused those losses. All of the evidence shows that there are a number of complex factors influencing which rural hospitals experience positive PPS margins and which suffer negative PPS margins.

Plaintiffs relied on evidence that they had done everything reasonable to operate efficiently, but they never established the causal link between the PPS and their financial losses. The fact that plaintiffs operate reasonably and still lose money is some inference that PPS is the cause, but there was insufficient evidence to support that inference, particularly where some plaintiffs admitted that they lose money on non-Medicare patients as well as on Medicare patients. This fact indicates that something more than the PPS reimbursement rate causes plaintiffs' negative margins. Whether any of plaintiffs' losses can be attributed to the PPS remains an unproven question.

Plaintiffs provided no specific proof of the reasonable, actual costs of any Medicare service. If they had, the Court could have evaluated their claim by comparing the reasonable costs with the PPS reimbursement. For instance, if plaintiffs had shown that a typical appendectomy or a typical acute-care room costs "X" dollars but that the PPS reimbursed them at a lesser amount, then the Court might conclude that plaintiffs suffered a significant monetary loss, an unconstitutional taking. *See e.g. Multicare Medical Center v. State of Washington,* 768 F.Supp. 1349 (W.D.Wash.1991) (factual assessment of reasonableness of Medicaid reimbursements). No evidence was presented of *actual* losses with reference to *actual costs.*

As it is, plaintiffs demonstrated only that they experienced declining margins similar to national statistics during the period of the PPS program. Even the ProPAC report of those statistics recognizes that many variables may affect those margins and that the effects of the PPS cannot be evaluated.

Plaintiffs failed to prove elementary causation. A taking results only if plaintiffs' "investment-backed expectations" have been significantly infringed by the regulations and, in this case, no evidence showed that the PPS reimbursement rates infringed on plaintiffs' expectations. Plaintiffs' evidence has not established the economic impact of the PPS reimbursement rate. Therefore, the Court need go no further in analyzing the other elements of plaintiffs' takings claim. The claim will be dismissed.

## B.  *Impairment of Contract Claim*

Alternatively, plaintiffs assert that the PPS reimbursement rates violate the due process clause of the Fifth Amendment by impermissibly impairing their contract rights under their Hill–Burton contracts. The Fifth Amendment incorporates the contract clause, set forth in Article I of the Constitution, and applies it to the federal government. *Bowen v. Public Agencies Opposed to Social Sec. Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986). Government regulations that substantially diminish contractual rights may create an unconstitutional impairment of the contract. *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 278–79, 89 S.Ct. 518, 524–25, 21 L.Ed.2d 474 (1969). The contract clause does not bar all impairments of contract, but, instead, bars only unreasonable, significant impairments. *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 21, 25, 97 S.Ct. 1505, 1517, 1519, 52 L.Ed.2d 92 (1977).

"Contracts, however express, cannot fetter the constitutional authority of Congress," but an unconstitutional taking may result if legislation significantly impacts on the contractual rights. *Connolly, supra,* 475 U.S. at 224, 106 S.Ct. at 1025 (quoting *Norman v. Baltimore & Ohio R. Co.,* 294

**700**

U.S. 240, 307–08, 55 S.Ct. 407, 415–16, 79 L.Ed. 885 (1935)).

 With regards to the impairment of contract claim, plaintiffs were required to prove that the government regulations substantially diminished their Hill–Burton contract rights. But, plaintiffs were unable to relate their declining PPS margins and financial losses to the PPS. The element of causation is once again missing. Even if the Court were able to infer that the PPS negatively affected plaintiffs' PPS margins, plaintiffs still failed to show that the PPS substantially diminished their contract rights. The evidence relied on by plaintiffs demonstrates that many, complex variables influence the PPS margins. No evidence identifies which of plaintiffs' financial losses could be attributed to the PPS rather than to the other variables.

Evidence that plaintiffs suffer financial losses is not enough, where plaintiffs failed to prove either the cause of those losses or the effect of the PPS. Similarity to nationally-based statistics is insufficient to make plaintiffs' case without an evaluation of the relevance of the statistics to plaintiffs and an understanding of the statistical methodology. Likewise, evidence that plaintiffs took many reasonable cost-savings measures and modified their operations is inconclusive where the financial impact of those measures was not analyzed, where other cost-variables were not considered, and where there was no determination of actual PPS costs compared to PPS revenues. The fact that some plaintiff-hospitals had positive PPS margins and the fact that some plaintiffs lost money on non-Medicare patients reveals that something more than the PPS rates are at play here. The Court is unable to identify which, if any, portion of plaintiffs' losses is caused by the PPS.

Plaintiffs have not sustained their burden to demonstrate a significant impairment of their Hill–Burton contract rights caused by the PPS. The Court will dismiss plaintiffs' impairment of contractual right claim.

## IV. CONCLUSION

Plaintiffs, who are mandatory Medicare providers, have failed to meet their burden to prove that the Prospective Payment System caused either an unconstitutional taking or an unconstitutional impairment of contract. Just because plaintiffs' reported costs have exceeded their PPS reimbursements, this Court cannot infer that those costs are reasonable or that the reimbursements are unreasonable. Without evidence of reasonable costs or evidence that the PPS rates are unreasonable, plaintiffs are unable to make a prima facie showing of causation and of the extent of the regulation's economic impact. Plaintiffs have shown no right to relief.

It is hereby

ORDERED that defendant's motion to dismiss, pursuant to Federal Rule of Civil Procedure 41(b), is granted. All claims in this case have now been ruled and final judgment is entered.