**H.C. ELLIOTT, INC.,**
**Plaintiff/Counter-Defendant,**

v.

**CARPENTERS PENSION TRUST FUND**
**FOR NORTHERN CALIFORNIA, De-**
**fendant/Counter-Claimant.**

**No. C–85–3528 RFP.**

United States District Court,
N.D. California.

July 2, 1987.

John T. Hayden, William F. Terheyden, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiff/counter-defendant.

Robert M. Hirsch, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for defendant/counter-claimant.

## MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

PECKHAM, Chief Judge.

### INTRODUCTION

Plaintiff and counter-defendant H.C. Elliott, Inc. ("Elliott") seeks injunctive and declaratory relief to prevent defendant and counter-claimant Carpenters Pension Trust Fund for Northern California ("Trust Fund") from enforcing an assessment of withdrawal liability in the amount of $750,-953. This withdrawal liability was determined under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1368, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1453. Both Elliott and the Trust Fund have moved for summary judgment.

Because this case presented novel issues, the court circulated a proposed order to the parties to obtain additional comment. The court has carefully considered the comments submitted, along with the parties' earlier briefs. For the reasons described below, the Trust Fund's motion for summary judgment is granted.

### FACTS

Plaintiff Elliott is engaged in the construction of housing tracts. Prior to June 1983, Elliott was signatory to a collective bargaining agreement, known as the Carpenters Master Agreement for Northern California ("agreement"), with the Carpenters 46 Northern California Counties Conference Board. The agreement required Elliott to make pension contributions to the Trust Fund on behalf of all carpenters hired by Elliott who were covered under the agreement.

Section 50 of the agreement required that an employer subcontract only to employers who also adhered to the agreement. Subsection 5 of this section required the employer to make Trust Fund payments when a subcontractor was delinquent in these payments. Carpenters Master Agreement for Northern California, section 50 ("Work Preservation Contracting and Subcontracting"), Supp. Decl. of Robert M. Hirsch, Feb. 10, 1986, Exh. A.

The agreement expired in June 1983. Negotiations for a new agreement reached an impasse in December 1983. At that time, Elliott ceased to have an obligation to make pension contributions to the Trust Fund under the provisions of 29 U.S.C. § 1392.

Elliott argues that, since November 1982, it has not performed any carpentry work for which it was previously required to make pension contributions, nor has it employed any carpenters or other employees to perform such work. Instead, Elliott alleges that it has contracted with independent carpentry subcontractors to perform the company's carpentry requirements. The president of Elliott, Harry C. Elliott, asserts that more than 80% of the carpentry work performed on Elliott developments since October 1982 has resulted in pension contributions to the Trust Fund through payments by the union carpentry subcontractors. Decl. of Harry C. Elliott, III, Dec. 11, 1985, at 3.

The Trust Fund alleges that Elliott employed as "assistant superintendents" several individuals who performed "warranty work" in each of the three years following 1982. Elliott's answers to defendant's interrogatories confirm that these assistant superintendents did indeed perform such warranty work from time to time, which included using carpentry tools such as hammers, tape measures, saws, and levels; according to Elliott, if the warranty worker could not perform the needed work himself, he would contact the appropriate subcontractor to do it. *See* Plaintiff's Answers to Defendant's First Set of Interrogatories, Sept. 27, 1985.

Section 46 of the Carpenters Master Agreement provided in pertinent part:

The Union and Employer agree that when employees are working in a supervisory position above the rank of foreman or general foreman, the individual employer *may* make payments with respect to his work into the Carpenters

Health & Welfare Trust Fund ... provided, however, the individual employer having made one (1) payment on an employee shall continue to make such payments so long as the employee is in his employ. *See* Decl. of Robert M. Hirsch, Jan. 13, 1986, Exh. F (emphasis added).

Elliott argues that assistant superintendents have never been covered employees under the collective bargaining agreement with the carpenters union and that contributions on their behalf have never been required. Elliott also alleges that, although voluntary contributions are allowed under the collective bargaining agreement, it has never made such voluntary contributions. According to Elliott, whenever employees were promoted from covered work to assistant superintendent, the company stopped making contributions to the Trust Fund for those employees and instead enrolled them in the H.C. Elliott Employee Profit Sharing Plan, which covers Elliott's management and non-union employees. The Chief Financial Officer and Secretary of Elliott maintains that the field representative of the Carpenters Trust Fund Administration Office agreed that the promotion of four individuals from covered work to assistant superintendent meant that Elliott would no longer have to contribute to the Trust Fund on their behalf. Decl. of Stephen Hemington, Jan. 26, 1986, at 3. A letter from the Trust Fund Administration Office states that the field representative "did not find any instances of improper reporting by [Elliott]." Decl. of Stephen Hemington, Jan. 3, 1986, Exh. 1.

## DISCUSSION

■ ERISA provides that the sponsor of a multiemployer pension plan determines initially when there has been a "withdrawal" from a pension plan by an employer and the resulting amount of liability on the part of that employer. 29 U.S.C. § 1382. The withdrawing contributor may ask the sponsor to review its determinations, 29 U.S.C. § 1399(b)(2)(A), but "[a]ny dispute between an employer and the plan sponsor ... concerning a determination made under sections 1381 through 1399 of ... title [29]

*shall* be resolved through arbitration." 29 U.S.C. § 1401(a)(1) (emphasis added).

The mandatory arbitration provision has withstood several constitutional challenges. *See Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1404–06 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985). Thus, subject to limited exceptions, a withdrawing contributor must exhaust its right to arbitrate before seeking review in federal court.

One of the limited instances where arbitration may be bypassed is where the issues involved require statutory interpretation. In such cases, exhaustion of arbitrative remedies is not required. *See I.A.M. National Pension Fund v. Stockton Tri Industries,* 727 F.2d 1204, 1209 (D.C.Cir. 1984); *I.A.M. National Pension Fund v. Schulze Tool & Die Co.,* 564 F.Supp. 1285, 1294 (N.D.Cal.1983). In bringing its action in this court, Elliott relies upon this exception to the mandatory arbitration provision of the MPPAA for statutory interpretation.

The MPPAA imposes liability upon a contributor to a multiemployer pension plan when the contributor "withdraws" from the plan, either completely or partially. 29 U.S.C. § 1381. A special definition of "complete withdrawal" for use in the building and construction industry is found at 29 U.S.C. § 1383(b). The relevant portion of that section provides that withdrawal occurs if (a) "an employer ceases to have an obligation to contribute under the plan," and (b) the employer "continues to perform work ... of the type for which contributions were previously required." 29 U.S.C. § 1383(b)(2).

The parties agree that, in this case, Elliott ceased to have an obligation to contribute under the plan in December 1983. Thus, the determination of whether withdrawal occurred in this case hinges on whether Elliott "continue[d] to perform work ... of the type for which contributions were previously required" after December 1983. Elliott asks that the court construe this statutory language.

A. *Does Elliott "Continue[ ] to Perform Work of the Type for Which Contributions Were Previously Required"?*

1. *"Continue[ ] to Perform Work."*

The Trust Fund argues that Elliott "continues to perform work," albeit indirectly, by hiring subcontractors to perform the company's carpentry needs. The use of such subcontracting requires that the court interpret the MPPAA in a context where no other federal court appears to have made an adjudication.

Elliott maintains that it ceased engaging in carpentry work in November 1982. It alleges that it no longer hires employees to undertake carpentry work; instead, Elliott hires independent subcontractors, who then hire employees to perform this type of work. Elliott argues that the companies with which it has contracted to perform carpentry work are totally separate and independent from Elliott. Each is an independent employer in its own right and, according to Elliott, completely responsible for its own employees' working conditions, compensation, and pension contributions.

Elliott asserts that it now purchases carpentry services that it formerly produced itself. The companies from which it buys are entities that "perform" the carpentry services, according to Elliott. The company therefore argues that it is a consumer where it was once a producer. As a consumer, Elliott argues, it does not "perform" carpentry services. Elliott thus asks that the court render judgment in its favor based on the argument that by no longer performing carpentry services directly, but instead purchasing the services of subcontractors, Elliott no longer "performs" work within the meaning of 29 U.S.C. § 1383(b)(2). In contrast, the Trust Fund argues that, by replacing its own employees with independent carpentry subcontractors, Elliott still causes carpentry work to be "performed". Neither the Trust Fund nor Elliott has provided the court with case law or legislative history dealing specifically with the statutory meaning of an employer's "performing" work under § 1383(b)(2).

However, the Supreme Court has articulated the intent of Congress in imposing liability on withdrawing employers generally under the MPPAA. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Although the Court there was speaking to the overall purpose of the MPPAA, the underlying case did come from the construction industry. *Id.* 106 S.Ct. at 1022. The Court first quoted the Executive Director of the Pension Benefit Guaranty Corporation as proposing:

[A]n employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities....

. . . .

We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan.

*Id.* The Court went on to note that "[a]fter 17 months of discussion, Congress agreed with the analysis put forward in the PBGC Report, and drafted legislation which implemented the Report's recommendations." *Id.*

Further, the legislative history of the MPPAA provides insights into the rationale Congress had for treating the construction industry differently from other industries for purposes of imposing withdrawal liability. That history reflects congressional awareness that many employers in the construction industry enter and leave the industry and that workers shift from employer to employer. Even if a pension plan is underfunded, as long as each current employer of a particular employee pays into the pension plan, the underfunding problem can presumably be deferred indefinitely into the future. The Trust Fund quotes the following passage from the legislative history of the MPPAA in the House of Representatives:

In the construction industry, the funding base of the plan is the construction projects in the area covered by the collec-

tive bargaining agreements through which the plan is maintained. An individual employee will typically work for tens or even hundreds of different employers over his or her working career, and the volume of work for a given employer will often fluctuate greatly from year to year. These normal events do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area. Therefore, the construction industry exception is designed to impose liability only on former contributors that continue to work within the plan's area. It exempts from liability employers that cease contributions because they have no work in the area; there is no liability when a company goes out of business, is sold, or is simply without work for a time.

H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 75–76, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2943–44. In arguing that the MPPAA imposes liability on Elliott in this case, the Trust Fund apparently relies on the above statement that the pension plan will be secure "as long as contributions are made for whatever work is done in the area."

Elliott provides an excerpt from the corresponding legislative history in the Senate:

[I]n [the construction] industr[y] an employer's leaving the jurisdiction of the plan or going out of business does not typically reduce the plan's contribution base. Rather, an employer reduces the plan's contribution base only if it continues to do what would have been covered work but does not have an obligation to contribute to the plan for that work. In order to protect the plan, that continuation of work without contributions is treated as withdrawal in [the construction] industr[y].

Senate Comm. on Labor and Human Resources, Summary and Analysis of Consid-

eration of S. 1076, 96th Cong., 2d Sess. 13 (1980).

Elliott also quotes the following passage from the MPPAA legislative history in the House: "because in the construction industry ... the withdrawal of an employer from a plan may not eliminate jobs from a plan's contribution base unless the employer continues working in the area, liability for employers in [this] industr[y] should be narrowly limited." H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 2, at 15, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 3004. Elliott urges that this passage supports its contention that the statutory language "continues to perform work" should be interpreted narrowly.

■ Congress' intent in treating the construction industry differently can be distilled down to the following concept: The demand for construction industry workers in a region is generally independent of whether a particular employer stays in business. If one employer leaves, another is likely to come along and replace it. Thus, pension fund contributions will probably continue relatively undiminished, even if one particular employer leaves. However, if an employer continues using construction workers but ends its obligation to make contributions, then the pension fund's future contributions are likely to be diminished accordingly. Such a withdrawing employer is properly assessed for its "fair share" of the pension fund's unfunded liabilities. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1022, 89 L.Ed.2d 166 (1986).

Elliott therefore overstates the case when it claims that "[i]n construction ... Congress has generally indicated that withdrawal liability is not to be imposed." Memorandum in Opposition to Proposed Order, Jan. 21, 1987, at 8. Congress intended no such blanket immunity.[1]

■ Based on this legislative history, this court rejects Elliott's contention that

---

1. Indeed, a key Supreme Court case upholding the constitutionality of the withdrawal liability provisions of the MPPAA arose from the construction industry. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018,

1022, 89 L.Ed.2d 166 (1986). The Court did not even find it necessary to discuss whether the employer there was subject to withdrawal liability despite being in the construction industry.

the work a building industry contractor "performs" is in all cases limited to that which is carried out by its own employees. Where an employer replaces its own employees, covered by the pension plan, with employees of a subcontractor, at least some of whom are not covered by the pension plan, the employer "reduces the plan's contribution base," which is precisely the problem Congress sought to discourage by imposing withdrawal liability in the construction industry.[2]

█ Elliott next argues that there has been no substantial erosion of the contribution base in this case because, according to the declaration of Elliott's president, more than 80% of the carpentry work on Elliott's housing developments since November 1982 has resulted in pension plan contributions through union carpentry subcontractors. In theory, therefore, a number of carpenters equal to 80% of those no longer working directly for Elliott have gone to work for another union contractor performing work for Elliott as a subcontractor.

Elliott's contention that 80% of its recent carpentry work has resulted in contributions to the Trust Fund cannot relieve it of withdrawal liability unless this court is willing to make wholesale changes to the statutory language adopted by Congress. Section 1383(b) is simply devoid of any suggestion that a "small" erosion in contributions can either be forgiven or result in a reduced liability. Under the statutory scheme, an employer either "ceases to have an obligation to contribute under the plan" or it does not, and an employer either "continues to perform work" or it does not. If these criteria are met, withdrawal liability is imposed.[3] This might be a different case if 100% of Elliott's carpentry subcontracting work since the time of its withdrawal had been performed by union subcontractors. Such a case would not involve any

erosion of contributions. However, the court is not presented with that question.

Nor can it be said that such a bright line test is inconsistent with congressional intent. It serves to prevent employers from "inching away" from a pension trust fund, which indeed appears to be what has happened here. Elliott's asserted 80% figure dates from a December 1985 declaration by its president. The Trust Fund now asserts that a key carpentry subcontractor used by Elliott went non-union in June 1986 and thereafter ceased contributing to the pension plan, so that Elliott's earlier estimate of 80% overstates the current figure. Decl. of Robert M. Hirsch, Jan. 26, 1987, at 2–3.

### 2. "Of the Type for Which Contributions Were Previously Required."

█ The next question is whether the carpentry work now performed by the subcontractors, and previously performed by a combination of Elliott's employees and subcontractors, was "work ... of the type for which contributions were previously required" within the meaning of 29 U.S.C. § 1383(b)(2)(B)(i). The answer to this legal question must necessarily turn on the provisions of the collective bargaining agreement that formerly governed Elliott's provision of pension payments.

It should be noted initially that the relevant question is whether Elliott was "an employer that ha[d] *an* obligation to contribute under a plan" with respect to work "of the type for which contributions were previously required." 29 U.S.C. § 1383(b) (emphasis added). The statute does not require that Elliott had the exclusive or even primary obligation, but merely *an* obligation. Thus, Elliott cannot escape this provision by the subterfuge of arguing that to the extent it previously employed sub-

---

**2.** Because 29 U.S.C. § 1385, which governs partial withdrawals, is not at issue in this case, the court declines to express an opinion as to whether the legislative intent of the MPPAA would require the phrase "continues to perform work," which appears twice in § 1385(b)(2)(A), to be construed in a similar manner.

**3.** Elliott's contentions could also be regarded as an attempt to assert that its withdrawal should be considered a "partial withdrawal" rather than a "complete withdrawal." However, partial withdrawals, with their less severe withdrawal liabilities, are treated under a different section, 29 U.S.C. § 1385, which neither party asserts should control here.

contractors to do carpentry work, contributions to the Trust Fund were primarily the responsibility of the subcontractors rather than Elliott. Such a loophole would be contrary to the plain words of the statute, and would be inconsistent with the congressional purpose of safeguarding multiemployer pension plans.

Section 50 of the collective bargaining agreement established the following liability on the part of Elliott:

> The individual employer has the *primary* obligation for performance of all conditions of this Agreement. The obligation cannot be relieved, evaded or diminished by subcontracting. Should the individual employer elect to subcontract, the individual employer shall continue to have such primary obligation and in the event his subcontractor defaults in any provision of this Agreement, the individual employer shall be liable for any such default of his subcontractor attributable to work on his job site or job yard in the same manner as if the work had been performed by and the default had been incurred by the individual employer itself.

Carpenters Master Agreement for Northern California, section 50(9), Supp. Decl. of Robert M. Hirsch, Feb. 10, 1986, Exh. A (emphasis added).

The Trust Fund contends, and the plain language of the agreement states, that Elliott had the primary obligation to make pension plan contributions on behalf of employees of any subcontractors. Elliott contends that it was merely a guarantor of payments by its subcontractors. However, because the statute requires only that "an employer ... ha[d] an obligation to contribute under a plan," it is not necessary to resolve which party is correct. At a minimum, section 50 would have required Elliott to provide pension payments on the part of a subcontractor that failed to make such payments on behalf of its employees. Furthermore, if Elliott had contracted with non-union subcontractors, in violation of subsection 3 of section 50 of the collective bargaining agreement, it surely would have been responsible for the payment of funds

to the Trust Fund based on the hours worked by these employees, even though such contributions would not have benefited the non-union employees themselves. *See Walsh v. Schlecht*, 429 U.S. 401, 410, 97 S.Ct. 679, 686, 50 L.Ed.2d 641 (1977). This is sufficient to make the work of Elliott's carpentry subcontractors "of the type for which contributions were previously required."

Despite contrary assertions by the Trust Fund, the uncontroverted evidence submitted by Elliott shows that Elliott never made pension payments on behalf of the union subcontractors it hired while subject to the terms of the collective bargaining agreement. Supp. Decl. of Harry C. Elliott, III, Aug. 7, 1986, at ¶ 2; Decl. of E.A. Hubbert, Aug. 6, 1986, at ¶ 4. Such evidence does not mean, however, that Elliott did not have liability for payments of this type. The company might well have been required to make payments for the type of work it currently performs. The fact that Elliott currently contracts with non-union subcontractors indicates that, if section 50 of the collective bargaining agreement were still controlling, the company would have to pay pension benefits based on this work (although paragraph 5 of section 50 would limit this liability to 90 days).

The court therefore concludes that Elliott has "withdrawn" under 29 U.S.C. § 1383(b)(2) because it has (a) ceased to have an obligation to contribute under the collective bargaining agreement, and (b) continued to perform work of the type for which contributions were previously required.

### 3. *Additional Considerations.*

■ The court is well aware of the potential harshness of this ruling if considerable withdrawal liability is ultimately assessed against Elliott. As Elliott points out, to the extent that the company employs union subcontractors that themselves provide pension contributions on behalf of their employees, then the Trust Fund enjoys a considerable windfall if Elliott must also make withdrawal liability payments. Nevertheless, similar prospects have not

deterred other courts from enforcing the dictates of MPPAA with respect to withdrawal liability. *See New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit Mix Corp.,* 612 F.Supp. 1003, 1009 (N.D.N.Y. 1985).

Furthermore, this seeming inequity must be considered in light of the congressional purpose of protecting multiemployer pension plans by discouraging voluntary withdrawals from them. Employers who wish to avoid "inequitable" withdrawal liabilities are free to abstain from withdrawing.

To the extent that the MPPAA imposes sizable and somewhat inequitable payments that serve to deter employers from withdrawing from a union pension system, the court is not at liberty to alter the statutory scheme. Unsatisfied litigants such as Elliott must look to the legislative arena, rather than the court, to obtain relief. As another district court has concluded:

> While it may seem unfair that Bellmont [the defendant] should be socked with over $110,000.00 in withdrawal liability when its own employees may seem to be protected, the Fund is doing nothing more than enforcing the provisions of the MPPAA when it assesses withdrawal liability against Bellmont.... This court will not second-guess the legislative wisdom behind the statutory withdrawal liability scheme.

*Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.,* 610 F.Supp. 1505, 1513 (N.D.Ind. 1985), *aff'd,* 788 F.2d 428 (7th Cir.1986).

The Supreme Court has noted:

> [A]s to the severity of the economic impact of the MPPAA, ... [t]he assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions.... There is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employ-

er must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme.

*Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 1026–27, 89 L.Ed.2d 166 (1986) (footnote omitted).

Having determined that Elliott is liable for withdrawal liability under the provisions of 29 U.S.C. § 1383(b)(2), the court need not reach the issue of whether "warranty work" by Elliott's employees also constituted a continuance of work of the type for which contributions were previously required.

**B.** *Determination of Withdrawal Liability.*

In its motion for leave to file an amended complaint, filed prior to this motion for summary judgment, Elliott also raises the issue of whether a housing construction site is a "facility" within the meaning of 29 U.S.C. § 1397(a)(2). If so, then the amount of Elliott's withdrawal liability would be reduced.

The amount of withdrawal liability includes, in part, "the employer's proportional share, if any, of the unamortized amount of the plan's unfunded vested benefits at the end of the plan year ending before September 26, 1980, as determined under paragraph (3)." 29 U.S.C. § 1391(b)(1)(B). Paragraph (3) provides that:

> An employer's proportional share of the unamortized amount of the plan's unfunded vested benefits for the last plan year ending before September 26, 1980, is the product of—
>
> (A) such unamortized amount; multiplied by—
>
> (B) a fraction—
>
> (i) the numerator of which is the sum of all contributions required to be made by the employer under the plan for the most recent 5 plan years ending before September 26, 1980, and
>
> (ii) the denominator of which is the sum of all contributions made for the

most recent 5 plan years ending before September 26, 1980, by all employers....

29 U.S.C. § 1391(b)(3). The smaller the numerator in the above fraction, of course, the smaller the product. Thus, if an employer is able to reduce the contributions required before September 26, 1980, it can reduce its overall withdrawal liability.

This decrease in the numerator is precisely the relief provided by 29 U.S.C. § 1397(a), which provides:

> For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after September 25, 1980 ... the amount of contributions ... allocable ... to work *performed at a facility at which all covered operations permanently ceased* before September 26, 1980 ... shall not be taken into account.

29 U.S.C. § 1397(a) (emphasis added).

Thus, if Elliott permanently ceased covered operations (i.e., carpentry services) at a particular housing tract construction worksite prior to September 26, 1980, the amount of withdrawal liability would be reduced if these construction sites constitute "facilities" within the meaning of 29 U.S.C. § 1397(a).

Elliott's motion for leave to amend its complaint provides no authority for its contention that the court would be able to render a legal judgment that construction sites are "facilities" within the MPPAA statutory scheme. Hence, Elliott's motion for leave to amend its complaint in this fashion is denied. This denial is without prejudice to renew the motion if Elliott is able to provide support for its interpretation of "facilities."

## C. *Orders for Payment.*

The Trust Fund also seeks orders requiring that Elliott pay it (1) the overdue withdrawal liability payments as determined by the Trust Fund, plus interest; (2) future withdrawal liability payments, as they become due; and (3) attorneys fees. These will be addressed in order.

### 1. *Overdue Withdrawal Liability Payments, Plus Interest.*

The Trust Fund notified Elliott in October 1984 that it had determined Elliott owed it a withdrawal liability of $750,953. The Trust Fund specified that this amount was to be paid in "monthly obligations" of $22,345.83, beginning in December 1984. Elliott has not paid any of this amount.

The MPPAA imposes stringent requirements on employers to pay withdrawal liabilities quickly, and a dispute over liability does not suspend the obligation to pay. 29 U.S.C. § 1399(c)(2) provides:

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

Elliott argues, without support, that the Trust Fund's request for an order requiring payment of withdrawal liability is premature until a final judicial interpretation of the statutory language has been rendered. In granting another trust fund's request for an order for an immediate payment of a withdrawal liability assessment, one court stated:

> Congress has made as explicit as possible its overwhelming concern with ensuring the integrity of multiemployer pension plans in the face of employer withdrawal. The Court will not permit the defendants to subvert this policy by using the judicial process as a means of further delaying or avoiding payment of sums which, under the statute, are already due and owing.

*Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky, Inc.,* 550 F.Supp. 35, 38 (S.D.N.Y.1982), *aff'd,* 738 F.2d 419 (2d Cir.1984).

This court agrees that Congress intended that employers pay their withdrawal as-

sessments and then seek to recover them through arbitration or judicial review. Accordingly, Elliott shall, within twenty days of this order, deposit with the Trust Fund the amount, plus interest, that the Trust Fund has determined to be Elliott's overdue withdrawal liability payments.

### 2. *Future Withdrawal Liability Payments.*

■ The Trust Fund also seeks an order requiring Elliott to pay its future monthly obligations of $22,345.83 as they become due. The Trust Fund relies on 29 U.S.C. § 1401(d), which provides in relevant part:

Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

There is no final arbitration decision in this case because Elliott has yet to request arbitration. The statute therefore requires Elliott to remain current in its monthly payments. *See Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 641–42 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

In sum, the court is requiring Elliott to pay its overdue withdrawal assessments, plus interest, as well as its future assessments as they become due. This result means that neither party will gain a collateral advantage, or suffer financial hardship, from pursuing this action for statutory interpretation in the courts. Of course, if Elliott ultimately prevails, it may be entitled to a refund of some or all of these payments.

### 3. *Attorneys Fees.*

The Trust Fund seeks an award of attorneys fees, basing its request on 29 U.S.C.

§ 1132(g)(2). That section provides in relevant part:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title [proscribing delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan ... reasonable attorney's fees and costs of the action, to be paid by the defendant....

The Ninth Circuit has held that awards of attorneys fees under § 1132(g)(2) are mandatory. *Operating Engineers Pension Trust v. Reed,* 726 F.2d 513, 514–15 (9th Cir.1984).

■ However, the Trust Fund's pursuit of an order for payment of delinquent contributions has been a relatively minor part of this case. Instead, the main emphasis has been a question of statutory interpretation. Awards of attorneys fees for such actions are discretionary with the court. 29 U.S.C. §§ 1132(g)(1), 1451(e). The Ninth Circuit has provided five factors to guide a discretionary award of attorneys fees under § 1132(g):

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 453 (9th Cir.1980).

Applying these guidelines, this court finds that (1) neither the Trust Fund nor Elliott has acted in bad faith, (2) no evidence has been submitted regarding Elliott's ability to pay an award of fees, (3) an award of fees might deter others from seeking statutory interpretations from the courts, (4) the Trust Fund did seek to resolve a significant legal question regarding

ERISA, and (5) both parties' positions were substantial and non-frivolous. Thus, factors 1, 3 and 5 weigh against an award of fees, factor 4 weighs in favor of an award, and factor 2 was not briefed. Balancing these factors, this court determines that a discretionary award of fees under § 1132(g)(1) is not appropriate.

Accordingly, the Trust Fund is granted an award of attorneys fees and costs limited to the portions of this case directly related to the order for payment of delinquent contributions; no attorneys fees are to be awarded for the portions of this case related to interpreting the statutory language of the MPPAA. The Trust Fund may submit a declaration of counsel detailing attorneys fees and costs it has incurred with respect to the order for payment of delinquent contributions.

## CONCLUSION

The court finds that Elliott has "continue[d] to perform work" by subcontracting carpentry work of the type for which it previously had liability to the Trust Fund. Accordingly, the Trust Fund's motion for summary judgment shall, barring the need for determination of additional legal questions by this court, be GRANTED and the parties shall proceed to arbitration to determine the appropriate amount of withdrawal liability in accordance with 29 U.S.C. § 1401(a)(1).

The plaintiff's motion to amend its complaint is DENIED without prejudice.

IT IS SO ORDERED.