**H.C. ELLIOTT, INC., Plaintiff–Appellant,**

v.

**CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, Defendant–Appellee.**

No. 87–2451.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1988.

Decided Oct. 21, 1988.

John T. Hayden, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiff-appellant.

Robert M. Hirsch, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for defendant-appellee.

Before SCHROEDER, NOONAN and O'SCANNLAIN, Circuit Judges.

SCHROEDER, Circuit Judge:

This is an action by a housing contractor against the Carpenters Pension Trust Fund for Northern California. The contractor, H.C. Elliott, Inc., sought declaratory and injunctive rulings that it had no liability to the Trust Fund under the withdrawal liability provisions of ERISA, the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* The Trust Fund counterclaimed seeking an order directing Elliott to pay its delinquent withdrawal liability payments, to submit disputes concerning withdrawal liability to arbitration and to pay installments as they become due. The case came before the district court on cross motions for summary judgment. The district court granted the Trust Fund's motion and ordered the parties to proceed to arbitration as to the amount of the liability. Chief Judge Peckham's careful opinion is reported at 663 F.Supp. 1016 (N.D.Cal.1987). We affirm.

The case calls for interpretation of 29 U.S.C. § 1383(b)(2). ERISA provides that when an employer withdraws from obligations under a collective bargaining agreement requiring trust fund contributions, the employer must pay an assessment to the fund. 29 U.S.C. § 1381(a). In the construction industry this obligation is imposed only on withdrawing employers who continue to perform the type of work covered by the agreement. 29 U.S.C. § 1383(b)(2). The principal issue in this appeal is whether Elliott, after its obligations under the collective bargaining agreement ceased, continued to perform such work by contracting with other companies for carpentry work within the carpenters' union jurisdiction.

Elliott is a housing contractor working in Northern California. Up until June of 1983, Elliott was signatory to the Carpenters Master Agreement for Northern Cali-

fornia with the Carpenters 46 Northern California Counties Conference Board. Its obligations under the collective bargaining agreement, including its obligation to contribute to a trust fund on behalf of its workers, ceased in December 1983 when negotiations for a new agreement reached an impasse. Beginning in November of 1982, however, Elliott had begun subcontracting its carpentry work and had ceased making contributions to the Carpenters trust fund. Although it continued as a housing contractor, the carpentry work on its projects was done by subcontractors rather than by its own employees.

The subcontracting provisions of the collective bargaining agreement to which Elliott was signatory are important for our resolution of the case. They affect our decision as to whether Elliott is continuing to perform the type of work covered by the agreement. Section 50 of the agreement required that signatory employers subcontract only to contractors willing to comply with the provisions of the agreement. The agreement further required that when a subcontractor was delinquent in making payments to the trust fund, the signatory employer was required to make those payments. In addition, the agreement placed upon the employer the "primary" responsibility for trust fund payments. Thus, the trust fund could look to a signatory employer for payments to the fund regardless of whether the work was done by employees of that employer or by employees of a subcontractor. Work covered by the agreement, therefore, included work done by subcontractors for purposes of the signatory employer's fund payment obligations.

Also important to our resolution of this case is the statutory history and purpose of withdrawal liability. The statutory provisions on withdrawal liability are part of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381–1453, and constitute amendments to ERISA. MPPAA was enacted to reduce the incentive for employers to terminate their affiliation with multiemployer pension plans. The MPPAA was intended to make it onerous and costly for them to withdraw.

H.R. No. 96–869, 96th Cong., 2d Sess., pt. 1, at 67, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2935.

The need for the MPPAA can only be understood in the context of ERISA's history. ERISA was enacted in 1974 because Congress was concerned that employees covered by pension plans were being deprived of anticipated benefits because of employer underfunding of those plans. *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726–27, 64 L.Ed.2d 354 (1980). At the initiation of pension plans, employers often guaranteed benefits to employees already employed the required amount of time, even though no contributions had yet been made to the plans to cover the past service. However, although the plans stated that employees would receive certain benefits after a certain length of employment, they also limited the employers' liability to the money actually available in the pension funds. Thus, if employers withdrew from underfunded plans, employees received only part of the benefits they had already earned.

Congress enacted ERISA to protect employees' vested interests. The statute included provisions requiring periodic reports, minimum participation, vesting and funding schedules, and standards of fiduciary conduct for plan administrators. *Id.* at 361 n. 1, 100 S.Ct. at 1726 n. 1. *See* 29 U.S.C. §§ 1001 *et seq.* In addition, ERISA created the Pension Benefit Guarantee Corporation (PBGC), a wholly owned government corporation that insures covered pension plans and provides benefits if the plans terminate with insufficient assets to support guaranteed benefits. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984) ("*Gray*"). If the PBGC pays benefits to employees covered by an underfunded plan, it requires reimbursement from the employer. *Id.* at 721, 104 S.Ct. at 2713.

The passage of ERISA in 1974 immediately obligated the PBGC to guarantee the benefits of single employer pension plans. However, the PBGC guarantee of multiem-

ployer pension plans was delayed for a period of time during which the PBGC had discretion to pay benefits and discretion concerning whether an employer should be forced to reimburse. *Id.* at 720–21, 104 S.Ct. at 2713–14. The PBGC often had to guarantee existing plans that would not be fully funded until the point in the future when the employers had contributed enough money to cover all employees, including those with past service credits.

As the date for mandatory coverage of multiemployer pension plans approached, Congress became concerned that the PBGC's upcoming obligation to guarantee those plans would bankrupt the corporation because of the large amount of past liabilities still underfunded in the plans. As a result of this concern, Congress asked the PBGC to prepare a report analyzing the problems faced by multiemployer plans and recommending action. *Id.* at 721, 104 S.Ct. at 2713; S.Rep. No. 95–570, 95th Cong., 1st Sess., pp. 1–4 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 4128, 4129–31.

The PBGC Multiemployer Study found that ERISA did not adequately protect plans from the harm resulting from individual employer withdrawals from multiemployer pension plans:

> A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 215, 106 S.Ct. 1018, 1021, 89 L.Ed.2d 166 (1986) (quoting *Pen-*

*sion Plan Termination Issues: Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th Cong., 2d Sess. 22 (1978) ("1978 Hearings") (Statement of Matthew H. Lind, PBGC Executive Director)). Based on the PBGC findings, Congress enacted the Multiemployer Pension Plan Amendments Act.

The MPPAA requires that employers withdrawing from multiemployer pension plans pay the unfunded vested benefits attributable to the withdrawing employers' participation. *Connolly*, 475 U.S. at 217, 106 S.Ct. at 1022. As the PBGC Executive Director explained,

> an employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities. In other words, the plan would have a claim against the employer for the inherited liabilities which would otherwise fall upon the remaining employers as a result of the withdrawal.... [W]e think that withdrawal liability would cushion the financial impact on the plan.

*Id.* at 216–17, 106 S.Ct. at 1022 (quoting 1978 Hearings, Statement of Matthew H. Lind, PBGC Executive Director). An employer's withdrawal liability is based upon its proportionate share of the plan's unfunded vested benefits, calculated as the difference between the present value of vested benefits and the current value of the plan's assets. *Gray*, 467 U.S. at 725, 104 S.Ct. at 2715; 29 U.S.C. §§ 1381, 1391. The basic rule applicable to most industries is that a withdrawing employer must pay its share of unfunded vested benefits.

For the construction industry, however, Congress enacted a somewhat different provision imposing withdrawal liability only when a contractor's obligation to the fund ceased and the contractor continued doing covered work. This provision was enacted because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor.

In the construction industry, the funding base of the plan is the construction projects in the area covered by the collective bargaining agreements through which the plan is maintained. An individual employee will typically work for tens or even hundreds of different employers over his or her working career, and the volume of work for a given employer will often fluctuate greatly from year to year. These normal events do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area.

H.R.Rep. No. 96–869, 96th Cong., 2d Sess, pt. 1, at 75, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2943, *quoted in H.C. Elliott, Inc. v. Carpenters Pension Trust Fund*, 663 F.Supp. 1016, 1020–21 (N.D.Cal.1987). The withdrawal of a signatory employer from a plan does not reduce the contribution base if the employer leaves the construction industry and other signatory employers take up the slack.

The withdrawal of any employer from the plan does decrease the base, however, if the employer stays in the industry but goes non-union and ceases making payments to the plan. To take this into account, the MPPAA makes withdrawal liability depend on whether the employer is continuing to do covered work. "[A]n employer reduces a plan's contribution base only if it continues to do what has been covered work but does not have an obligation to contribute to the plan for that work. In order to protect the plan, that continuation of work without contributions is treated as a withdrawal." *Elliott*, 663 F.Supp. at 1021 (quoting Senate Comm. on Labor and Human Resources, Summary and Analysis of Consideration of S. 1076, 96th Cong., 2d Sess. 13 (1980)). *See* 29 U.S.C. § 1383(b)(2)(B)(i). Thus the statute provides:

A withdrawal occurs ... if ... an employer ceases to have an obligation to contribute under the plan, and ... the employer ... continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required....

29 U.S.C. § 1383(b)(2).

The district court held that because Elliott had an obligation under section 50 of the agreement to make contributions to the plan, including primary responsibility for subcontractor payments, Elliott, by subcontracting its carpentry work, nevertheless continued to perform work for which contributions were previously required. *Elliott*, 663 F.Supp. at 1022–23. It further observed that at least some of the subcontractor's employees were not covered by the plan, so that the contribution base for the plan had in fact been reduced. "Where an employer replaces its own employees, covered by the pension plan, with employees of a subcontractor, at least some of whom are not covered by the pension plan, the employer 'reduces the plan's contribution base.'" *Id.* at 1022. The court held that because Elliott continues to perform work for which contributions were previously required, it is subject to withdrawal liability.

In this appeal, Elliott first argues that the statutory language requires that it be an "employer" after it withdraws from the plan, and that it is no longer an "employer" because it is subcontracting its carpentry work. This is not an argument which was raised in the district court, and hence Judge Peckham's opinion did not address it. It is, however, an issue of statutory interpretation which we may address in our discretion. *Commodity Futures Trading Comm'n v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 581 (9th Cir.1982). Because it is easily disposed of, we do so.

■ The relevant statutory language upon which Elliott relies states that

[A] withdrawal [from a multiemployer plan] occurs ... if ... an employer ceases to have an obligation to contribute under the plan, and ... the employer ... continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required....

29 U.S.C. § 1383(b)(2). Elliott contends that because it is no longer directly employ-

ing any workers doing work within the jurisdiction of the union, it is not an "employer" within the meaning of the statute.

The flaw in Elliott's argument, however, is that the statute contains no requirement that the withdrawing party remain a direct employer. The statute uses the word "employer" only to identify the entity to whom the withdrawal liability provision applies if the entity continues to do work covered by the collective bargaining agreement: "a complete withdrawal from a multiemployer plan occurs when an employer ... permanently ceases to have an obligation to contribute under the plan." 29 U.S.C. § 1383(a)(1). The word "employer" describes one who was a signatory employer with respect to the plan. This Elliott clearly was.

▪ The key question here then, as in the district court, is whether Elliott, after its obligation to contribute under the plan ceased, continued "to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." It is clear from the collective bargaining agreement to which Elliott was signatory that Elliott was responsible for payments to the pension fund for all work done either by its own employees or by its subcontractors' employees. Elliott was obliged under the terms of the collective bargaining agreement either to contribute on behalf of its own carpenters, to hire union subcontractors making their own contributions to the fund, or to make up any delinquencies. Accordingly, we are in full agreement with the district court when it concluded that regardless of whether the carpentry tools were wielded by Elliott's employees or a subcontractors' employees, Elliott continued to do work of the type for which contributions were previously required.

This conclusion is in accord with an opinion letter in this record issued by the PBGC stating that an employer is subject to withdrawal liability based on its use of subcontractors if the collective bargaining agreement made the employer responsible for payments on behalf of subcontractor employees. The letter discussed employees ceasing to perform construction work directly, and instead subcontracting their construction work. The PBGC stated that

> [u]nder these circumstances there is no withdrawal *unless the employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement.* If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required. (emphasis added).

PBGC, Op.Ltr. 85–5 (Jan. 30, 1985).

Even if reasonable minds could differ as to the proper interpretation of the statute, we would be obligated to follow the interpretation in the PBGC ruling because of the deference owed to its rulings and opinions. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed. 2d 246 (1981); *Nachman Corp.*, 446 U.S. at 371–72, 100 S.Ct. at 1731–32. In addition, the PBGC ruling is consistent with Congressional intent:

> Elliott's contention that the work a building industry contractor "performs" is in all cases limited to that which is carried out by its own employees [must be rejected]. Where an employer replaces its own employees, covered by the pension plan, with employees of a subcontractor, at least some of whom are not covered by the pension plan, the employer "reduces the plan's contribution base" which is precisely the problem Congress sought to discourage by imposing withdrawal liability in the construction industry.

*Elliott*, 663 F.Supp. 1021–22.

▪ Finally, Elliott argues that even if the statutory language and intent were to require withdrawal liability, it should not be imposed in this case because it would be inequitable to do so. It argues that it has in fact subcontracted its work to subcontractors who have made payments to the fund for the bulk of the work done by the subcontractors' employees. It suggests that the fund will somehow obtain a windfall if withdrawal liability is imposed on Elliott.

Withdrawal liability is designed to require the withdrawing employer to pay its fair share of the fund's preexisting vested obligations which the fund presently lacks projected assets to pay. Congress intended the payment as a condition of an employer's obtaining release from a continuing legal obligation to make payments to the fund, a release which Elliott will now enjoy.

To the extent that Elliott argues that a small erosion of coverage should be entitled to forgiveness, Judge Peckham's opinion hits squarely upon the mark:

> Section 1383(b) is simply devoid of any suggestion that "small" erosion in contributions can either be forgiven or result in a reduced liability. Under the statutory scheme, an employer either "ceases to have an obligation to contribute under the plan" or does not, and an employer either "continues to perform work" or it does not. If these criteria are met, withdrawal liability is imposed.... Nor can it be said that such a bright line test is inconsistent with congressional intent. It serves to prevent employers from "inching away" from a pension trust fund, which indeed appears to be what has happened here.

*Id.* at 1022. We agree.

We are here concerned only with Elliott's contention that equitable considerations should preclude all withdrawal liability. To the extent that there are any legitimate equities which might militate in favor of the contractor in this situation with respect to the amount of its withdrawal liability, they can be considered during the course of arbitration. There are no equitable circumstances which would permit us to grant the relief that Elliott seeks, which is complete avoidance of withdrawal liability.

The judgment of the district court is AFFIRMED.