COLORADO SPRINGS PRODUCTION CREDIT ASSOCIATION, et al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et al., Defendants.

SIKESTON PRODUCTION CREDIT ASSOCIATION, et al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et al., Defendants.

CHATTANOOGA PRODUCTION CREDIT ASSOCIATION, et al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et al., Defendants.

Civ. A. Nos. 88–0574, 88–0583 and 88–0584.

United States District Court, District of Columbia.

July 18, 1988.

16

Barton L. Enoch, Colorado Springs, Colo., Thomas C. Seawell, Denver, Colo., Patricia D. Douglas, Washington, D.C., for Colorado Springs Production Credit Ass'n.

D. Robert Cumming, Carey P. DeDeyn, Sutherland, Asbill & Brennan, Atlanta, Ga., Warren N. Davis, Mac Asbill, Jr., Sutherland, Asbill & Brennan, Theodore C. Hirt, David M. Souders, U.S. Dept. of Justice, Civil Div., Washington, D.C., for FCS FAC; Victor A. Cohen, Sr. Atty., Farm Credit Admin., McLean, Va., of counsel.

Carlos C. Smith, William C. Carriger, Edward D. Meyer, Chattanooga, Tenn., Jeffrey H. Howard, Linda E. Benfield, Miller & Chevalier, Washington, D.C., for Chattanooga Production Credit Ass'n, et al.

Ward & Reeves, Caruthersville, Mo., Blanton, Rice, Sidwell & Ottinger, Sikeston, Mo., Peter C. Myers, Jr., David E. Blanton, James E. Reeves, Jeffrey H. Howard, Linda E. Benfield, Miller & Chevalier, Washington, D.C., for Sikeston Product Credit Ass'n, et al.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs, several production credit asso-

ciations ("PCAs"),[1] chartered under the Farm Credit Act of 1971, as amended, and operating under 12 U.S.C. § 2091, challenge as unconstitutional Section 201-6.29 of the Agricultural Credit Act of 1987, which requires PCAs to make a one-time purchase of "stock" from defendant Farm Credit System Financial Assistance Corporation ("FAC") in an aggregate amount of $177 million. This matter now comes before the Court on defendants'[2] motion to dismiss for lack of jurisdiction and for failure to state a claim, and plaintiffs' opposition thereto. For the reasons set forth below, defendants' motion is denied in part and granted in part.

## I. FACTUAL BACKGROUND

The Farm Credit System, established by Congress in 1916,[3] is the nation's single largest agricultural lender. During 1985,

1986, and 1987, the System experienced significant losses due to the general economic condition of the agricultural community.[4] Sikeston Complaint, ¶ 14. In response, Congress enacted several amendments seeking to improve the System's poor financial condition.[5] Most recently, Congress enacted the Agricultural Credit Act of 1987, Pub.L. No. 100-233, which established a plan whereby a combination of funds from the System's healthy institutions, primarily the PCAs, and money from the United States Treasury would be used to revitalize the System. Before examining in more detail the changes implemented by the 1987 Act, brief background on the structure of the Farm Credit System is necessary.

The Farm Credit System comprises 407 institutional members in twelve farm credit districts nationwide. Each of the twelve districts has one of each of the three types

---

1. Plaintiffs in Civil Action No. 88-0583, Sikeston PCA, Delta PCA, and Southern Illinois PCA, are all located within the Sixth Farm Credit District, comprised of Arkansas, Illinois, and Missouri, and are served by the Federal Intermediate Credit Bank ("FICB") of St. Louis, Missouri. Sikeston Complaint, ¶ 11.

   The thirteen plaintiffs in Civil Action No. 88-0574 are located in the Ninth Credit District, comprised of Colorado, New Mexico, Kansas, and Oklahoma, and are served by the FICB of Wichita, Kansas. Colorado Springs Amended Complaint, ¶ 11.

   In Civil Action No. 88-0584, the five plaintiff PCAs are located in Tennessee, Kentucky, and Ohio, the Fourth Farm Credit District, which also includes Indiana. Chattanooga Complaint, ¶¶ 1, 11.

   Plaintiffs in these three consolidated actions will be referred to collectively as "the PCAs," except where the various plaintiff groups of PCAs have asserted distinct arguments.

2. Defendant Farm Credit Administration is an independent agency of the United States created pursuant to 12 U.S.C. § 2241, and Farm Credit System Financial Assistance Corporation ("FAC") is a federal instrumentality of the United States created by the Agricultural Credit Act of 1987, § 201, Pub.L. 100-233, 101 Stat. 1568. The motion to dismiss was originally brought only by defendant Farm Credit Administration, but has subsequently been joined in by defendant FAC.

3. Federal Farm Loan Act of 1916, Pub.L. No. 64-158.

4. In 1985, the System lost nearly $2.7 billion, and it lost another $1.9 billion in 1986. In 1987,

some marked improvement was shown, but a loss of $1.3 billion was projected for the year. H.R.Rep. No. 100-295, 100th Cong., 1st Sess. 57 (1987); S.Rep. No. 230, 100th Cong., 1st Sess. (1987), U.S.Code Cong. & Admin.News 1987, pp. 2723, 2728.

5. *See* Farm Credit Amendments Act of 1985, Pub.L. No. 99-205, 99 Stat. 1678 (creating Farm Credit System Capital Corporation); Farm Credit Amendments Act of 1986, Pub.L. No. 99-509 (allowing amortization of current losses under "regulatory" accounting principles).

   The regulations promulgated under the 1985 amendments, which implemented compulsory transfers of funds through the Farm Credit System Capital Corporation from financially *stronger* Federal Credit System institutions to those in need of assistance, were challenged by several PCAs, including some of those now before this Court, in federal district court. Some courts granted injunctive relief, *see, e.g., Sikeston Production Credit Ass'n v. Farm Credit Admin.,* 647 F.Supp. 1155 (E.D.Mo.1986) (regulations constituted a taking and deprivation of property without due process), *dismissed as moot, Sikeston Production Credit Ass'n v. Farm Credit Admin.,* Nos. 86-2418, 86-2357 (8th Cir. Mar. 1, 1988), others denied it, *see, e.g., Central Kentucky Production Credit Ass'n v. United States of America,* No. 86-2056 (D.D.C. Oct. 3, 1986), *vacated as moot,* 846 F.2d 1460 (D.C.Cir. 1988).

   The 1987 Act effectively dismantled the 1985 regulatory scheme and, among other provisions, formulated a new assessment scheme directly by statute.

of Farm Credit System Banks: (1) a Federal Land Bank ("FLB"), which makes long-term agricultural loans through the Federal Land Bank Associations ("FLBAs"); (2) a Federal Intermediate Credit Bank ("FICB"), which finances short- and intermediate-term agricultural loans through the individual Production Credit Associations ("PCAs"); and (3) a Bank for Cooperatives ("BC"), which makes loans to agricultural cooperatives.[6] This case focuses on the relationship between the PCAs and the FICBs.[7]

PCAs, which lend directly to farmers, were created by Congress in the Farm Credit Act of 1933 and initially started with all federal funds. All of the government capital was paid back by the PCAs in 1968, however, and they are all now fully owned by their farmer-members. H.Rep. No. 96–1287, 96th Cong., 1st Sess. 16 (1980), U.S. Code Cong. & Admin.News 1980, pp. 7095, 7099. To obtain a loan from a PCA, a farmer must own or purchase stock or certificates in the PCA in the amount of 5% of the loan. 12 U.S.C. § 2094.[8] PCAs can give their shareholders dividends, allocations, patronage distributions in stock, certificates, and cash; shareholders are also entitled to the assets of the PCAs upon liquidation. 12 U.S.C. §§ 2094, 2095. PCAs must, however, obtain FICB approval of loan terms and conditions, dividends, and interest rates. 12 U.S.C. §§ 2073(a), 2094(i), 2096(b). The PCAs must also maintain a surplus account as prescribed by the FICBs, 12 U.S.C. § 2096(b), and cannot liquidate without FICB approval. 12 U.S.C. § 2183(a). PCAs elect their own directors, officers, and shareholders, but the salary of their officers and employees, and the appointment and compensation of the chief

executive officer, must be approved by the FICBs. 12 U.S.C. §§ 2072, 2093, 2094, 2096. The FICBs provide funds to the PCAs through loans and sale of stock, and depend on the PCAs as the FICBs' sole shareholders. 12 U.S.C. § 2073(b). FICBs can require the local PCAs to purchase initial or additional stock in an amount determined by the banks in order to meet the banks' capital needs. 12 U.S.C. § 2073(b), (c), (g).[9]

The Agricultural Act of 1987 introduced two new entities into this network of agricultural credit organizations: (1) the Farm Credit System Assistance Board ("Assistance Board"), to provide financial assistance to FCS institutions, 12 U.S.C. § 2278a, and (2) the Farm Credit System Financial Assistance Corporation ("FAC"), to raise capital for the Assistance Board. 12 U.S.C. § 2278b. Congress provided that the FAC's funds would be generated using two mechanisms: an "assistance" fund and a "trust" fund. Under Section 201–6.26, 12 U.S.C. § 2278b–6, FAC will issue up to $4 billion in 15–year debt obligations guaranteed by the United States Treasury. This money will be used to purchase stock in ailing institutions, providing a "direct capital infusion" for the FCS. Plaintiffs do not challenge Congress' wisdom in establishing this assistance fund, but do vigorously object to the creation of the trust fund, which is funded solely from the proceeds from a one-time purchase of FAC "stock" by the PCAs and FCS Banks. Section 6.25(b), 12 U.S.C. § 2278b–5; Section 6.29, 12 U.S.C. § 2278b–9. Congress required each PCA to purchase stock in the amount by which its "unallocated retained earnings"[10] exceeds 13% of its assets, measured as of

---

6. There is an additional Bank for Cooperatives located in Denver, Colorado, making a total of 37 Farm Credit System Banks nationwide. Colorado Springs Amended Complaint, ¶ 8.

7. PCAs have no direct relationship with the other two types of Farm Credit System Banks—the Federal Land Banks or the Banks for Cooperatives.

8. The PCAs have two kinds of stock: Class A (nonvoting) and Class B (voting).

9. PCAs may obtain funds from institutions outside of the FCS, but must first obtain FICB approval. 12 U.S.C. § 2093.

10. A PCA's unallocated retained earnings do not include the funds it needs to cover future loan losses, institutional stock, participation certificates, allocated equities, or operating expenses. Defendant Farm Credit Administration's Motion to Dismiss, at 10 n. 9.

December 31, 1986.[11] The trust fund monies will be invested by FAC in United States Treasury securities, Section 6.25(b), 12 U.S.C. § 2278b–5, and used as a "capital cushion" by FAC in administering the $4 billion assistance fund. Beginning five years after FAC issues the bonds, the trust fund is available to cover any default by FCS institutions on payments of interest due on those bonds. 12 U.S.C. § 201–6.26(d)(3)(A)(i). After 15 years, the trust fund will be used to cover defaults on the loan principal, *i.e.*, to redeem that institution's preferred stock that was issued to obtain financial assistance from FAC. 12 U.S.C. § 201–6.26(d)(3)(B)(iii). Upon termination of the FAC, any money in the trust fund will be transferred to the Insurance Fund established by Section 302–5.60.

Plaintiffs allege that, in exchange for purchasing the stock, they receive no benefits of any kind and that the stock "is and will always be worthless." Sikeston Complaint, ¶ 23. The "stock" is stock in name only, and amounts to "nothing more than evidence of the amount of the assessment levied on each contributing institution." Sikeston Supplemental Complaint, ¶ 9 (Appendix I). Defendants do not dispute that the stock provides no direct benefit to plaintiffs, but contend that the reward for the PCAs is the general system-wide benefit of improving the financial condition of the Farm Credit System, if not rescuing it from disaster. Overall, defendants characterize the Farm Credit System as a nationwide, cooperative, interdependent network of quasi-governmental financial institutions and stress that the federally-chartered PCAs are a vital and integral part of this system.[12] In contrast, while acknowledging that the PCAs generally operate under the supervision of the FICB for each district, plaintiffs paint a picture of the PCAs as virtually independent, wholly farmer-owned, autonomous lending agencies, a "loose federation of individual corporations" that have little important contact with the other FCS institutions. As discussed below, the various public and private characteristics of the PCAs directly affect the analysis of the constitutional challenges raised by plaintiffs in this case; and, the Court finds that the inherency and strength of these characteristics require further development.

After the Court denied temporary relief, plaintiffs made the required stock purchases on March 7, 1988.[13] Section 201–6.29(d). Plaintiffs then supplemented or amended their complaints to renew their substantive challenge to Congress' legislative trust fund scheme.

## II. ANALYSIS

Plaintiffs challenge the one-time stock purchase scheme as:[14] (1) a taking for public use without just compensation in violation of the fifth amendment; (2) a deprivation of property without due process in violation of the fifth amendment; (3) a denial of plaintiffs' rights of access to the courts; and (4) a bill of attainder.[15]

In viewing a motion to dismiss, a complaint should not be dismissed for failure to state a claim "unless it appears beyond

---

**11.** Congress also required all System Banks to purchase FAC stock, but in an amount exceeding 5% of their assets. § 2278b–9(a)(1)(A).

**12.** Defendants point out, for example, that all 37 FCS banks are jointly and severally liable on the System's debt obligations. 12 U.S.C. § 2155. Even though the PCAs are not so liable, defendants contend that their fate is closely connected to the banks because of their shareholder status.

**13.** The Colorado Springs plaintiffs were assessed a total of $29,615,235.00, Colorado Springs Amended Complaint, ¶ 15; the Sikeston PCAs were required to purchase stock in the amount of $6,694,055.00, Sikeston Complaint, ¶ 20, Sikeston Supplemental Complaint, ¶ 10;

and the Chattanooga PCAs were required to purchase a total of $12,352,855.00 of FAC stock. Chattanooga Complaint, ¶ 20.

**14.** The arguments raised by the three groups of plaintiffs differ in certain respects, but will be treated together except where otherwise noted. *See* Defendant's Motion to Dismiss, at 13–14 nn. 14–20.

**15.** Plaintiffs have not pursued their claim that their due process rights are violated by the civil penalty provision of the 1987 Act, Section 423. Sikeston Opposition, at 5, 27; Chattanooga Opposition, at 7. None of the plaintiffs have been assessed any civil penalties and the issue is clearly not ripe for adjudication.

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1506 (D.C.Cir.1984); 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1357, at 594 (1969). Plaintiffs have sufficiently alleged their two primary fifth amendment claims under this liberal standard.

### A. Fifth Amendment Taking Claim

■ Plaintiffs' primary challenge to the one-time stock purchase is that it constitutes a taking of private property for public purpose without just compensation in violation of the fifth amendment of the Constitution.[16] As outlined above, plaintiffs are required to purchase from FAC "stock" in an amount equal to their unallocated retained earnings in excess of 13% of their assets.

Plaintiffs allege that their unallocated retained earnings are their private property; the earnings are capital privately owned by the PCAs, and, indirectly, by their respective farmer-shareholders. Sikeston Complaint, ¶ 13; Colorado Springs Amended Complaint, ¶ 13; Chattanooga Supplemental Complaint, ¶ 14. Defendants do not dispute that ever since the PCAs repaid the federal government in 1968, the PCAs have been borrower-owned. Plaintiffs further contend that their "surplus" earnings have resulted from their own prudent operations and management decisions, including, for example, their decisions to allow earnings to accumulate or to obtain lower interest rates rather than to seek distributions, and are not attributable to their relationship with the FCS or the

FICBs. Even though defendants point out that the unallocated retained earnings of the PCAs are subject to substantial supervision and regulatory control by the FICBs, plaintiffs have sufficiently indicated that they may well be able to prove that the funds are private. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). Accordingly, plaintiffs have sufficiently alleged the threshold issue of their taking claim. Whether the assessment of plaintiffs' property ultimately is found to constitute a taking under the fifth amendment, of course, cannot be resolved at this preliminary stage. The Court finds, however, that plaintiffs have sufficiently stated a taking claim to survive defendants' motion to dismiss.

In *Connolly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), the Supreme Court set forth three factors of "particular significance" for courts to consider in determining whether a "taking" is forbidden by the Fifth Amendment: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. *Id.* at 225, 106 S.Ct. at 1026 (citing *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).[17] These factors do not constitute a precise formula, but rather aid a court in making the required ad hoc, factual inquiry into the circumstances of the particular case. *Id.* at 126, 98 S.Ct. at 2660. An examination is in order as to whether plaintiffs have sufficiently alleged such facts.

### 1. Economic Impact on Claimant

Plaintiffs claim that, as a result of the stock purchase, they have suffered and will

---

**16.** Plaintiffs have clearly failed to state a claim that the assessment violates the Fifth Amendment's taking clause because their property is being taken for a *private* use. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984) (public use requirement satisfied if government's action is rationally related to a conceivable public purpose).

**17.** Plaintiffs' reliance on the recent Supreme Court property condemnation decisions, *Nollan v. California Coastal Comm'n,* — U.S. —, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* — U.S. —, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), is misplaced. *Connolly* provides the correct standard in this regulatory taking setting.

continue to incur direct and indirect damages, seriously undermining their future viability. *See* Sikeston Supplemental Complaint, ¶¶ 13, 15; Chattanooga Supplemental Complaint, ¶ 13. For example, plaintiffs state that the assessments will require the PCAs to raise interest rates and that the book value of their stocks and certificates will decrease. Sikeston Supplemental Complaint, ¶ 15 (Exhibits D, E). The PCAs predict that the effect of being stripped of a large amount of their unallocated retained earnings and, in return, having received nothing of value, will result in serious economic injury and may threaten their very viability.

For the purposes of this motion to dismiss, the Court accepts as true plaintiffs' allegations that the economic impact on the PCAs of the assessment is severe; the stock has no apparent tangible value and the impact of the assessment on the PCAs may well be significantly detrimental.[18]

### 2. *Interference with Investment–Backed Expectations*

Plaintiffs assert that the one-time stock purchase meets the second *Connolly* criteria because it interferes with their investment-backed expectations. Although defendants claim that the PCAs had notice that additional regulatory burdens would be imposed—because PCAs are inherently federal instrumentalities and also because Congress in recent years has frequently legislated concerning the Farm Credit System in an attempt to solve or mitigate the farm crises—plaintiffs have raised specific and potentially persuasive claims that the 1987 Act shattered rather than conformed with their investment expectations.

According to the PCAs, at least prior to 1985, no PCA could reasonably expect to be assessed for any losses of other FCS institutions. Indeed, they argue, when Congress attempted to impose such a requirement in the 1985 Act, the PCAs were able to defeat it through litigation. According to the PCAs, their stockholders-borrowers relied on the financial security and management of the local PCAs in deciding whether to borrow funds; it is reasonable to assert that these farmers, the sole shareholders of the PCAs, did not anticipate that a significant amount of their PCA's unallocated retained earnings, which allowed them to maintain low interest rates among other advantages, would disappear virtually overnight. Finally, even defendants must concede that the "stock" has no tangible value to the PCA shareholders. A reasonable investor's expectation in purchasing stock is that some return or benefit will be received in return. Thus, plaintiffs have clearly alleged that the stock purchase plan significantly disrupted their investment-backed expectations.

### 3. *Character of the Governmental Action*

Plaintiffs' arguments are less strong, but nonetheless persuasive, with regard to the third criteria mentioned in *Connelly* —the character of the governmental action. Defendants contend that Congress had a clear public purpose in mind when it enacted the one-time stock purchase; it was "a public program [that merely] adjust[ed] the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026. They claim that the new capital reserve for the FCS will promote confidence in the system and generate necessary investment in FCS securities.

In contrast, plaintiffs contrast this case to *Connolly*, arguing that there is no rational relationship between the amount required to be paid and the prior history or obligations of the PCAs; they contend that the government action is purely arbitrary. Plaintiffs further suggest that the only reason that Congress decided to have the PCAs contribute to the trust fund, which is

---

**18.** Colorado Springs Amended Complaint, ¶ 19; Chattanooga Complaint, ¶ 23. Plaintiffs allege that the stock lacks an ascertainable and assured value—it is not transferable, has no voting rights, pays no dividends, has no redemption rights, shareholders get no share of assets upon dissolution, termination, or liquidation, there is no preference in assistance from the FAB or FAC or FICB, and shareholder PCAs have no privileges different than the nonshareholder PCAs.

backed by the Treasury, was to avoid placing the revitalization program in the budget. Even the extensive regulation of PCAs by the FICBs and the FCA does not explain the heavy assessment on the assets of the PCAs, which are "healthy" FCS institutions. In short, plaintiff's questions about the arbitrariness of the governmental action only confirm that plaintiffs' allegations sufficiently raise issues under the three factors set out in *Connolly* to survive defendants' motion to dismiss.

## B. Fifth Amendment Due Process Claims

■ Plaintiffs also challenge the stock purchase scheme as violative of the due process clause of the fifth amendment because PCAs are not entitled to a hearing on the amount of the assessment and because the formula employed is not rationally related to the objectives of the 1987 Act.

Defendants first challenge plaintiffs' standing to claim a right to a hearing on the calculation of their contributions to the trust fund. Plaintiffs do not allege that the assessments, which have already been paid, were improperly calculated under the formula set by Congress in the 1987 Act.[19] Since there is no allegation of injury-in-fact, plaintiffs' due process claims as to the lack of a hearing must be dismissed for lack of standing. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ Plaintiffs also vigorously contend that the formula violates their substantive due process rights because it is not rationally related to a legitimate governmental purpose. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438

U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978). If the legitimate governmental purpose of the 1987 Act was to help solve the FCS's financial problems, they contend, then that mission is adequately accomplished by the $4 billion assistance fund. In comparison, the trust fund of $177 million is "insignificant," even "puny." Conceding that investor confidence may well be promoted by the backing of the assistance fund by the United States Treasury, plaintiffs suggest that the trust fund itself does nothing to promote investor confidence. The only reason that Congress set up the trust fund with non-governmental funding, plaintiffs argue, was for reasons of political expediency—to keep it "off budget." [20] Further, plaintiffs argue that the trust fund is irrational on its face—PCAs pay to the fund in excess of 13% and banks in excess of 5%. The formula is also alleged to be arbitrary because it uses a point in time (December 31, 1986), rather than an average of the PCAs' unallocated retained earnings; since there are significant seasonal fluctuation in loan volumes, the measurement can lead to arbitrary results. Finally, plaintiffs assert that a PCA's unallocated retained earnings are an inappropriate measure of the PCA's ability to pay. Some PCAs resorted to borrowing funds from the FICBs in order to pay the assessment in March. The legislative history, they contend, provides no support for the formulaic scheme chosen by Congress.

In response, defendants argue that the statute fairly takes ability to pay into account by allowing each PCA to retain 13% of its unallocated retained earnings. In addition, most of the assets in the Farm Credit System were located in the PCAs,[21] it was necessary for the health of the entire FCS to transfer this wealth to other financial institutions, and the percentage

---

**19.** The Sikeston PCA plaintiffs contend that they were treated unequally in that PCAs in Texas were allowed to use regulatory accounting practice rather than generally accepted accounting principles, but they do not contend that, as to them, the formula was improperly calculated. Sikeston Opposition, at 22.

**20.** *See* Sikeston Supplemental Complaint, Appendix I, at 5 ("Requiring System institutions to

establish the Trust Fund permits the Federal guarantee of the principal and interest with respect to the debt obligations issued by FAC to be scored as "off-budget," a result that was considered by some to be essential, as a political matter, in achieving passage of the 1987 Act.")

**21.** S.Rep. No. 452, 100th Cong., 1st Sess. 15 (1987).

formula takes ability to pay into account. Finally, defendants contend that the stock purchase protects the United States Treasury by covering defaults on future payments on FAC bonds, and this is a legitimate and rational governmental purpose.

In consideration of these arguments, the Court finds that although plaintiffs have no standing to state a claim as to the calculation of the assessments, they have, nonetheless, sufficiently alleged that the formula enacted by Congress is not rationally related to the revitalization scheme to survive the motion to dismiss.

### C.  Denial of Access to Courts

■ Plaintiffs' third challenge is that Section 6.29(e) denies due process because it requires the PCAs to purchase the stock before filing suit; their right of access to the courts is chilled and restricted by the requirement that they purchase the stock before seeking a civil remedy. As this Court has previously indicated, *see* Order March 4, 1988, the statute's jurisdictional requirement is constitutional; the government had a strong interest in taking prompt action to solve the agricultural crisis and has provided grievants with post-assessment review procedures. *Bob Jones University v. Simon*, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); *Haralson v. Federal Home Loan Bank Board*, 837 F.2d 1123 (D.C.Cir.1988). This claim, therefore, must be dismissed.

### D.  Bill of Attainder

Plaintiffs' final claim is that the stock purchase constitutes a bill of attainder in violation of Article 1, Section 9 of the Constitution. Plaintiffs allege that the stock purchase requirement is not a necessary component of the 1987 Act and that Congress intended to punish these plaintiffs in passing Section 201–6.29. Sikeston Complaint, ¶ 37.

■ A bill of attainder is a law which legislatively determines guilt and inflicts punishment on individuals or a readily ascertainable group without the protections

of a trial. *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Merely because the consequences of legislation are burdensome does not, of course, make it a bill of attainder. Rather, plaintiffs must prove that the legislature intended to classify and punish, that the legislation does not serve nonpunitive goals, and that the burden falls within the historical meaning of punishment. *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). This plaintiffs cannot do.

■ The only allegation plaintiffs make here is based on one snippet of legislative history that indicates that some Senators were aware of the litigation of some PCAs against the prior amendments to the Farm Credit Act, that they "were critical" of these PCAs for "avoiding contributions to the System's recovery," and there was discussion of "increasing the assessment of the associations." Chattanooga Complaint, ¶ 38 (quoting S.Rep. No. 230, 100th Cong., 1st Sess. 66 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2723, 2737). This remark does not constitute an adequate basis for a bill of attainder claim.[22] Here, Congress enacted a system-wide legislative scheme seeking to remedy the farm crisis; the burden may have fallen heavily on the PCAs, but plaintiffs cannot show that congressional intent was punitive. Accordingly, plaintiffs' last claim must be dismissed.

### III.  CONCLUSION

Accordingly, for the reasons set forth above, it is

ORDERED that defendants' motion to dismiss is denied in part and granted in part. Plaintiffs shall have the opportunity to prove their allegations that the one-time stock purchase constitutes a taking of private property for public use in violation of the fifth amendment and that the assessment formula denied them substantive due

---

**22.** *See News America Publishing, Inc. v. Federal Communications Comm'n,* 844 F.2d 800 (D.C. Cir.1988).

process in that it was not rationally related to the purposes of the 1987 Act; and it is

FURTHER ORDERED that defendants and plaintiffs shall submit to the Court on or before August 4, 1988 a joint status report indicating how they intend to proceed in this litigation.

IT IS SO ORDERED.